## IN RE EDEN F. ET AL.*
### (AC 16417)

Spear, Hennessy and Healey, Js.

Argued September 24, 1997—officially released April 7, 1998·

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book (1998 Rev.) § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Roger E. Bunker*, for the appellant (respondent mother).

*Linda Pearce Prestley*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Ann-Marie DeGraffenreidt*, assistant attorney general, for the appellee (petitioner).

*David T. Stone*, for the minor children.

*Opinion*

HEALEY, J. This is an appeal from the decision of the trial court granting petitions to terminate a mother's parental rights in her two children, Eden and Joann. The department of children and families (department) filed both petitions for termination on the ground that the mother, Ann F., had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the [ages] and needs of the [children], [she] could assume a responsible position in the [lives] of the [children]" as required by General Statutes (Rev. to 1995) § 17a-112 (b), now § 17a-112 (c).[1]

The following facts are relevant to this appeal. Ann F. was born in Hartford on February 27, 1959. The

[1] At the time the petitions were filed, June 26, 1995, General Statutes (Rev. to 1995) § 17a-112 (b) provided: "The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child or that, with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parent of a child who

department of children and youth services (DCYS)[2] removed her from her biological parents at the age of three months. She was removed from her home because her mother had been admitted to an inpatient psychiatric care facility. DCYS attempted for six years to reunify her with her mother. When DCYS did reunify them, Ann F. was six years old and spoke only English while her mother spoke Spanish. The reunification failed and Ann F. spent the majority of her childhood in a foster home. In 1975, at the age of fifteen,[3] Ann F. was admitted for psychiatric care to Norwich State Hospital (Norwich). Thereafter, she was admitted to Norwich on several more occasions with one stay lasting for more than one year.[4] At Norwich, she was diagnosed with "chronic undifferentiated schizophrenia" and other disorders over the years, including bipolar disorder with psychotic features.

has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. If the court denies a petition for consent termination of parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child."

[2] Effective July 1, 1993, the department of children and youth services was succeeded by the department of children and families. See General Statutes (Rev. to 1995) § 17a-1 (c).

[3] Ann F. has a ninth grade education.

[4] Ann F. has also had admissions to Manhattan State Hospital and Bellevue Hospital in New York City, as well as several admissions to Cedarcrest Regional Hospital in Newington.

While at Norwich, Ann F. met and married Thomas F.[5] in 1982 and her first child, Eden, was born on July 2, 1988. Eden is a child with special needs. DCYS removed Eden from Ann F.'s care when Eden was only five days old, due to Ann F.'s psychiatric state. The court granted temporary custody of Eden to DCYS on July 15, 1988. On September 22, 1989, Eden was committed to the commissioner of children and youth services as a neglected child because of the hospital admission of Ann F. On that date, Ann F. signed expectations[6] that were accepted by the court. Eden remained in foster care until she was nearly three years old.

Although on January 31, 1991, the court granted DCYS's petition to extend Eden's commitment, Eden began living with her mother on February 1, 1991. While Eden lived with her mother, DCYS worked with Ann F. and provided a number of services to her. On June 13, 1991, the commissioner of children and youth services filed a petition to revoke Eden's commitment. The court granted DCYS's motion to revoke commitment on August 7, 1991.

In 1992, DCYS received four referrals concerning Ann F.'s conduct with Eden, including a report of Ann F.'s yelling, shaking and hitting Eden. Another referral, which was made just prior to the birth of Ann F.'s second child, Joann, on September 8, 1992, was from the Manchester police department on July 16, 1992, alleging that "[t]he mother, Ann F., is a repeated complainant of sexual assault and strange goings on at the home. She claims that Randy M., the father of the child [Joann], sneaks in through the window at about 1:30 a.m. and sexually assaults [her]." That report also stated

[5] Apparently little is known of Ann F.'s relationship with Thomas F. except that she considered him to be involved with cocaine and that he was extremely abusive to her.

[6] The expectations were papers that described steps Ann F. needed to follow to facilitate the return of Eden to her care.

that she usually slept through it. It also indicated that "[t]he condition of the apartment is very slovenly with trash and clutter strewn about. The smoke detector was also deactivated due to the removal of the battery." In a call to DCYS, Ann F. reported that her boyfriend, Randy M., would break into her apartment with seven men who sexually harassed her and performed witchcraft techniques on her.

In March, 1993, DCYS received a referral from the Manchester Memorial Hospital emergency room that Ann F. had walked out of the visitor's lounge leaving Eden, then age four, to care for Joann, then nearly seven months old. At that time, Ann F. was admitted to the hospital on a physician's emergency certificate,[7] and DCYS invoked a ninety-six hour hold on both children, who have been cared for in the same foster home ever since. Ann F. was transferred from Manchester Hospital to Cedarcrest Regional Hospital (Cedarcrest), where she remained until August, 1993. Upon her discharge from Cedarcrest, she began receiving services from the Manchester Memorial Hospital Outpatient Mental Health Clinic and the Horizons program. Horizons "provides services to the psychologically impaired so they can live independently in the community." Her case manager, Candace Stone, worked with Ann F. up to the time of trial.

On March 12, 1993, DCYS filed a petition seeking the commitment of Eden and Joann. On that date, the court granted an order of temporary custody of both children to DCYS. On October 21, 1993, the court adjudicated Eden and Joann neglected based on Ann F.'s plea of nolo contendere. The court committed the children to the department for the statutory period. Also on that

---

[7] On March 12, 1993, a social worker went to retrieve Ann F. from the hospital to transport her and the two children to a shelter when he learned that Ann F. had decompensated and would not be discharged.

date, Ann F. signed, and the court entered, a new set of expectations.

Ann F. was hospitalized three times in 1993 for mental instability. Eden and Joann were taken for weekly visits with Ann F. while she was in Cedarcrest in 1993. Weekly visitation continued after she returned home. Ann F. continued outpatient treatment at the Manchester Memorial Hospital Outpatient Mental Health Clinic. Throughout the remainder of 1993 and into the first six months of 1994, Ann F. stabilized within her limitations and participated in weekly supervised visits with her two children.

On June 1, 1994, the department developed what it called "an extensive plan . . . to determine what was in the best interest of [Ann F.'s] children." This plan was to "give [Ann F.] every opportunity to prove her parenting abilities" and was to be executed through "the Exchange Club," which would supervise the children's visits with Ann F. The length of these visits would be increased from one hour to one and one-half hours for seven weeks. If these visits were successful, a series of unsupervised visits could be scheduled.

At a department case status conference on July 26, 1994, the consensus opinion was that "due to Eden's escalating behaviors" she should be "thoroughly evaluated by Newington Children's Hospital PEDAL[8] medical program," which evaluation began at the end of August, 1994. On September 4, 1994, in accordance with the Exchange Club recommendation, four weeks of unsupervised visitation began but there was no mechanism to assess these visits since they were unsupervised. On October 8, 1994, four weeks of overnight visitation began, with an emergency telephone line available if Ann F. "needed assistance or had an emergency." These

---

[8] PEDAL is an acronym for program for evaluation of development and learning.

visits again could not be assessed since they were unsupervised. In any event, the children did not show any evidence of physical abuse. In late October, 1994, a decision was made to return Eden to Ann F. on a trial basis for two months to make a final determination of Ann F.'s "capabilities of caring for this child." The department's position was: "If this two month trial was successful then strong consideration would be given to returning the youngest child, Joann, home." In November, 1994, it was decided to put on hold Eden's return home to Ann F. until Ann F. obtained her own apartment.

Eden was returned to Ann F. on February 27, 1995. Difficulties with the reunification quickly appeared. At the time of Eden's return, PEDAL was in the midst of conducting a comprehensive evaluation of Eden as requested by the department. As part of this evaluation, Eden was seen for the following: pediatric neurology, psychiatry, ophthalmology, audiology, psychology, education and occupational therapy. The testing for this evaluation occurred from December, 1994, through April, 1995. The results of the PEDAL evaluation were not disclosed until after April 19, 1995. The evaluation indicated that Eden "is diagnosed with Reaction Attachment Disorder compounded by symptoms of depression, behavioral disturbance, including oppositionality and defiance." The evaluation made a number of suggestions on how to address Eden's needs given her "substantial behavioral and emotional issues."

Upon Eden's return to her mother, Eden did not attend school for almost three weeks. The department was aware, *before* Eden was returned to her mother, that there was a problem with the Manchester board of education in gaining her admission. Nevertheless, the department returned her.

Additionally, Eden's parent-child therapy with Thomas Spudic, a psychologist who worked with Ann

F. and the children, ceased in December, 1994, when he left Connecticut. Therapy was not resumed until sometime in March, 1995, after Eden was returned to Ann F. Moreover, even though the department made arrangements for a parent aide,[9] who came once "within the first week or so" of Eden's return, neither the new therapist nor the parent aide was in place when Eden was returned.[10]

A crisis telephone line was put in place when Eden was returned to Ann F. The crisis line, aptly named, had as its apparent purpose to enable rapid communication by Ann F. with department staff. On Sunday, March 12, 1995, Ann F. called the crisis line and stated that she "needed someone to talk to and Eden had been a little out of control."[11] Apparently, Ann F. was required to leave this information in a message. Kenneth Crosby, a department social worker, returned Ann F.'s call to the crisis line the following Friday, March 17, 1995, five days later.

On Tuesday, March 21, 1995, the department removed Eden from her mother's home and returned her to foster care. This removal followed an incident that occurred the prior weekend and also was reported to the department. Ann F., who had been caring for Eden without respite for twenty-four hours a day for about three weeks, went to a bingo game in the neighborhood with a female friend. Ann F. left Eden in the care of two men, one of whom Ann F. hardly knew, but who was acquainted with Ann F.'s female friend. The child of

---

[9] The parent aide visited Ann F.'s home twice during the three weeks Eden was there in February and March, 1995.

[10] Although no dates were given, the referral for the parent aide and some pastoral care were made before Eden's return.

[11] The department "Social Study for Termination of Parental Rights," written by Kenneth Crosby, a department social worker, stated the following: "3/17/95 this worker called [Ann F.] about her having called the crisis line at 12 a.m. at night the previous Sunday. [Ann F.] stated she had needed someone to talk to and Eden had been a little out of control."

Ann F.'s female friend was also there. When Ann F. returned later that evening, there were beer cans strewn about her apartment, the sink was full of dishes and Eden's bedroom was "trashed." There was no indication, however, that Eden had been harmed in any way.

The day after the department removed Eden, it received a report of Eden scratching her mother as well as an anonymous caller who reported hearing Eden cry, "Mommy, don't hit me."[12] The department replaced Eden in her former foster home. Joann was not returned to Ann F. at all in 1995.

On April 6, 1995, the parties agreed to, and the court granted, an extension of the commitment to the department for the statutory period beginning April 21, 1995. On June 26, 1995, the department filed petitions in the Superior Court, Juvenile Matters, seeking to terminate the parental rights of Ann F., Randy M., the alleged father of Joann, and Thomas F., the father of Eden. Each petition alleged that "[t]he child has been found in a prior proceeding to have been neglected or uncared for. The . . . mother [Ann F.] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . she . . . could assume a responsible position in the life of the child." This ground is alleged to have existed for more than one year.[13] On July 20, 1995, the court accepted Thomas

---

[12] The trial court found that such a report had been made, but not that any hitting had in fact occurred.

[13] General Statutes (Rev. to 1995) § 17a-112 (b) provides in relevant part: The superior court . . . may grant such petition if it finds, upon clear and convincing evidence, that . . . over an extended period of time, which . . . *shall not be less than one year* . . . (2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Emphasis added.)

F.'s affidavit of consent to termination of his parental rights as to Eden. The petition concerning Joann was thereafter amended to allege that Randy M. had abandoned Joann, that he failed to rehabilitate and that there was no ongoing parent-child relationship as provided in § 17a-112 (b). On July 24, 25, 26, 29 and 30, 1996, a trial was held on both petitions. At the trial, the court entered a default on July 24, 1996, against Randy M. for failure to appear after service by publication had been made in the Manchester Journal Inquirer.

At the trial, the department produced testimony on its case from the following: psychiatrist Richard Sadler; clinical psychologist David Mantell; Crosby; Janet Romayko, Eden's therapist in the community; Andrea Moran, one of Eden's therapists at Natchaug Hospital; Pavinee Saguansatsya, another of Eden's therapists at Natchaug Hospital; and the foster mother of the children. The respondent Ann F. produced testimony from herself; Ilda DePina, a department social service assistant; Stone, Ann F.'s mental health care manager; Steven Alloy, Ann F.'s psychiatrist; Benita Montalvo; Tina DeCosta; and Carol Anne Preste.[14] There was no rebuttal.

Mantell prepared court-ordered psychological evaluations in 1993 and 1995.[15] On October 4, 1993, a time when both children had visitation with Ann F. once a week, Mantell, by court referral, undertook individual psychological and relationship evaluations of both the mother and the children. He reported that Eden "exhibited poor work product, short attention span, avoidance, resistance, inappropriate affect, oppositionality, pleasure from causing interpersonal distress and a broad range of socially and emotionally inappropriate

---

[14] Montalvo and DeCosta are referred to as "friends and neighbors" of Ann F., while Preste is referred to as "another friend" of Ann F.

[15] Prior to any adjudication of the petitions, Mantell and Sadler conducted court-ordered evaluations. Both testified at the trial.

behavior." He stated that she adduced "the profile of a significantly troubled child and that she appears to have substantial developmental delay." As to Joann, who was only one year old at that time, he noted that "her development seems to be broadly within average limits. She was a pleasant child who posed no difficulties on the evaluation day."[16] With reference to Ann F., about whom he had been given a good deal of historical information, he said: "It is evident that the mother had a significant history of mental disorder that has impaired her ability to function as an adult and also as a parent." Aware of her bipolar status and her medication regimen, he said that "[h]er general manner of presentation is that of a psychologically simple, anxious, naive and child-like person with low stress tolerance who is being maintained by medication and substantial support service." This report recommended "that the children not live with the mother at this time."

Sadler evaluated Ann F. in September, 1993. At that time, he was unable to assess who was the psychological parent of the children as he did not interview either child, nor did he see them interact with the major parenting figures in their lives. The trial court, in reviewing this report, noted Sadler's opinion that Ann F. had a stable and chronic psychiatric condition that had seriously impaired her functional abilities over many years, as well as her requirement of repeated hospitalizations and supportive outpatient treatment efforts. Sadler stated in this report that "[Ann F.'s] history strongly suggests that [she] is unlikely to be able to develop parenting skills which have not been demonstrated in the past [and that] no discussion by [her] indicates an adequate appreciation of the deficits which would need

---

[16] Mantell's report as to Joann also stated: "Individual developmental assessment of her was not requested and may not be necessary unless concerns arise."

to be corrected for her to maintain a stable environment for her children."

On October 4, 1995, Ann F. indicated to Sadler that the department was "going for a Termination of Parental Rights . . . . I asked to have the younger daughter as she's easier to handle . . . . Eden came back to me totally depressed. I could handle it." He also said that "much better than ordinary parenting will be needed [for] Eden in order to deal successfully with her handicaps and to capitalize upon her personality, intellectual and physical strengths."

On May 26, 1994, Spudic[17] wrote of Ann F.'s "considerable progress in her ability to stay focused, to speak coherently about her problems, and in her ability to relate to Eden [as well as his being] very impressed with her genuine love for these children and her desire to be with them." He nevertheless believed that her problems in dealing with the children "seem to be exclusively a product of her emotional state/bipolar disorder . . . and [that] it is clear that she continues to have significant emotional problems." He concluded that "although [Ann F.] has made significant strides in caring for herself, I question her ability *at this time* to care for her children on a full-time basis. . . . [I]t is far from certain whether she could care for herself and both children . . . even with considerable support." (Emphasis in original.) Some six months later, on December 5, 1994, Spudic again reported his pessimism "about Eden making it permanently back with her mother," commenting that "Eden is extremely challenging from a behavioral point of view." Iterating Ann F.'s "heart of gold," Spudic candidly indicated that he hoped that he "might be proved wrong in [his] prediction about the outcome of reunification."

---

[17] Spudic did not testify at the trial. The trial court, however, relied on two letters by Spudic in its decision.

Crosby[18] testified that the department actually had no intention of reunifying Joann with her mother unless the reunification of Ann F. with Eden was successful.[19] No comment was made that the department, in deciding to return Eden first, discussed that issue with Mantell or any other therapist. The department admitted that when Eden was returned to her mother in February, 1995, Eden was being evaluated at Newington Children's Hospital and that that evaluation had been ongoing "for a period of time."[20] The department, however, did not await the outcome of that evaluation before returning Eden to Ann F. in February, 1995, because to do so would have added months more "before the reunification could have occurred."

At trial, Sadler stated that the department did not consult with him about the reunification before

---

[18] Crosby, who testified at length during the trial, was a department treatment worker who was responsible for keeping case records involved in these cases. Such a worker basically manages cases, assesses needs, provides services for the rehabilitation of families, provides reports concerning them and the like. He prepared the department's "Social Study for the Termination of Parental Rights" in the two petitions in this case that came into evidence. The study was referred to on a number of occasions during the trial.

[19] On cross-examination of Crosby, the following questions and answers appear:

"Q. So Joann's reunification with her mother depended upon her mother's success with Eden?

"A. That's correct."

Later in the cross-examination, the following took place:

"Q. But if [Ann F.] failed with Eden, then Joann would not be returned, is that correct?

"A. That's correct.

"Q. Therefore Joann's reunification with her mother was dependent upon the success of Eden's reunification with her mother?

"A. We wanted to see if [Ann F.] had the ability to parent Eden, initially.

"Q. And if she had the ability to parent Eden then you would determine that she had the ability to parent Joann?

"A. *But we were going to consider returning Joann.*" (Emphasis added.)

[20] This evaluation of Eden began in 1994 and was completed in April, 1995, *after* Eden was removed from her mother's care.

returning Eden to Ann F. Ann F.'s psychiatrist, Alloy, testified that the reunification would have had "a greater chance of success to start working [if Ann F. were reunified] with the more normal child, the younger daughter."

In its August 5, 1996 memorandum of decision, the trial court found in the adjudicatory phase that in late 1994 and early 1995, "[the department] worked with other service providers to reunify Eden with her mother."[21] The trial court referred to the belief of Crosby, the department caseworker, that Ann F. had spent more time with Eden (two years) than with Joann and that if there were any bonding between the mother and the children, it was more likely to be with Eden. The trial court also relied on Mantell's view that while there was no evidence of an ongoing relationship between Ann F. and Joann, "there [was] some evidence of a more distant bonding between the mother and Eden with great conflict and dissatisfaction in the relationship, particularly on Eden's side." In addition, the trial court observed in its memorandum of decision that the social study prepared by the department and the reports of Sadler and Mantell all recommended the termination of parental rights.

The trial court found "by clear and convincing evidence that the parents have not achieved a useful and constructive role as parents; nor, given the needs of the children, especially Eden, [was] such rehabilitation foreseeable within a reasonable time. General Statutes

---

[21] It can fairly be said that this is as specific as the trial court gets about reunification in its memorandum on the adjudicatory phase. We, however, do point out that in the dispositional phase of its decision, the trial court stated that "[e]fforts to reunite the child Eden with Ann [F.] were made in February, 1995," while at the same time stating that "[e]ven the mother agreed that Eden was too difficult for her to control. The department has unintentionally allowed an inordinate period of time, three and one-half years, for Ann [F.] to acquire the skills and stability to effectively parent those children . . . ."

(Rev. to 1995) § 17a-112 (b) (2)." It then proceeded in the dispositional phase to find that the termination of parental rights was "in the best interests of the children."

By motion dated August 23, 1996, Ann F. requested reargument. That motion alleged, inter alia, that the department had failed to prove by clear and convincing evidence "that it made reasonable efforts to reunify either child with her mother."

The trial court denied the motion in a written memorandum, pointing out that "a review of the file" reflects that "reasonable efforts" at reunification were made on two occasions in 1993 and once again while the case was pending on April 6, 1995. The court stated that "the department of children and families has made reasonable efforts given the situation and circumstances to provide counseling for Ann [F.], which she has continuously utilized. Efforts to reunite the child, Eden, with Ann [F.], were made in February, 1995. The child was subsequently removed in March, 1995. Even the mother agreed that Eden was too difficult for her to control. . . . The mother simply does not have the intellectual or emotional wherewithal to raise these two children." Moreover, the trial court noted that its written decision specifically addressed this matter.

In addition, Ann F. also filed a "Motion for Articulation of Decision Terminating Parental Rights of Mother."[22] The trial court, in articulating its decision,

[22] That motion requested articulation of the following issues:

"1. Did the Court find that the petitioner made reasonable efforts to reunify Eden F. with her mother?

"2. Did the Court find by clear and convincing evidence that the petitioner made reasonable efforts to reunify Eden F. with her mother?

"3. Did the Court find that the petitioner made reasonable efforts to reunify Joann F. with her mother?

"4. Did the Court find by clear and convincing evidence that the petitioner made reasonable efforts to reunify Joann F. with her mother?

stated, inter alia, that it responded to each of the five specific questions raised, including the finding that the department had made reasonable efforts to reunify both Eden and Joann with their mother. The court concluded that those findings were supported by clear and convincing evidence.[23]

On appeal from the judgments terminating her parental rights with respect to Eden and Joann, Ann F. has raised the following issues: (1) the trial court incorrectly determined that the department made reasonable efforts to reunify both children with Ann F. by clear and convincing evidence; (2) the trial court made improper findings insofar as they related to Ann F.'s failure to rehabilitate herself as alleged in both petitions; and (3) the trial court's conclusion to terminate her parental rights was not in Eden's best interests as required by § 17a-112 (b). Because we find that the department did not make reasonable efforts to reunify either child, as stated in the first issue, we need not address the second and third issues.

A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book §§ 1042.1 and 1043.1, now Practice Book (1998 Rev.) §§ 33-1 and 33-5. See *In re Romance M.*, 229 Conn. 345, 356, 641 A.2d 378 (1994). It is not necessary, however,

---

"5. Did the Court find that the respondent mother failed to rehabilitate because she has not achieved a useful and constructive role as a parent?"

[23] The articulation responded to the issues stated by Ann F. as follows:

"1. The court did find [that] the [department] made reasonable efforts to reunify Eden F. with her mother.

"2. That finding is supported by clear and convincing evidence.

"3. The court did find that the petitioner made reasonable efforts to reunify Joann F. with her mother.

"4. That finding is supported by clear and convincing evidence.

"5. The court finds that the respondent mother has failed to achieve a useful and constructive role as a parent and, even with the best of intentions, is incapable of overcoming deficiencies in her parenting skills. *In re Luis C.*, 210 Conn. 157, 169 [554 A.2d 722] (1989). . . ."

that the two phases be the subject of separate hearings. One unified trial, as occurred with the two petitions that are the subject of the appeal now before us, is permissible. *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 257, 471 A.2d 1380 (1984); *State* v. *Anonymous*, 179 Conn. 155, 172, 425 A.2d 939 (1979).

"Although the procedure of one trial is sanctioned, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged in each of the . . . petitions and, hence, is limited to events preceding the filing date of [the petitions]. The dispositive phase is concerned with what action should be taken in the best interest of the child and, as to that phase, the court is entitled to extend its consideration to matters occurring until the end of the trial . . . . *In re Juvenile Appeal (84-AB)* [supra, 192 Conn. 267, 267–68 n.14]. The dispositive phase is not reached unless the grounds alleged in the adjudicatory phase are proven." *In re Shannon S.*, 41 Conn. Sup. 145, 146, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989).

Certain other well established principles generally govern the termination of parental rights. Our Supreme Court has said: "General Statutes (Rev. to 1989) § 45-61b (g), now codified as § 45a-707 (g), defines the termination of parental rights as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his or her parent. It is, accordingly, a most serious and sensitive judicial action. *Anonymous* v. *Norton*, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their

children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). . . . *In re Jessica M.*, 217 Conn. 459, 464–65, 586 A.2d 597 (1991).

"It bears emphasis that a judicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents. Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only *after* statutory grounds for termination of parental rights have been established by clear and convincing evidence. (Emphasis in original.) *In re Valerie D.*, 223 Conn. 492, 511, 613 A.2d 748 (1992); *In re Jessica M.*, supra, [217 Conn. 466]. [A] parent cannot be displaced because someone else could do a better job of raising the child. . . . *Matter of Corey L* v. *Martin L*, [45 N.Y.2d 383, 391, 380 N.E.2d 266, 408 N.Y.S.2d 439 (1978)]; *In re Jessica M.*, supra, 467; see comment, The Two-Pronged Inquiry—The Best Alternative for the Conflicting Rights

Involved in Proceedings for Termination of Parental Rights, 13 Conn. L. Rev. 709 (1981).

"Although, as a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination of parental rights; *In re Barbara J.*, [supra, 215 Conn. 31, 45, 574 A.2d 203 (1990)]; *In re Luis C.*, 210 Conn. 157, 165, 554 A.2d 722 (1989); *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services*, [177 Conn. 648, 671–72, 420 A.2d 875 (1979)]; [i]nsistence upon strict compliance with the statutory criteria before termination . . . can occur is not inconsistent with concern for the best interests of the child. *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services*, supra, 672." (Internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 279–81, 618 A.2d 1 (1992).

The standard of proof applicable to a proceeding for the termination of parental rights is that of "clear and convincing evidence." *Santosky* v. *Kramer*, supra, 455 U.S. 748. The *Santosky* court said, "We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." Id., 769.

Despite the fact that our legislature did not insert the "clear and convincing" standard as to the "reasonable efforts" requirement of § 17a-112 until 1996; see Public Acts 1996, No. 96-246, § 18; our Supreme Court did state some years before that *Santosky* "held that due process requires the state to prove the allegations in a petition to terminate parental rights by clear and convincing evidence before those rights could be terminated." *In re Juvenile Appeal (83-AB)*, 189 Conn. 58, 60, 454 A.2d 271 (1983); see *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 268.

The standard for review on appeal is whether the challenged findings are clearly erroneous. *In re Luis C.*, supra, 210 Conn. 166; *In re Christina V.*, 38 Conn. App. 214, 223, 660 A.2d 863 (1995). The determinations reached by the trial court that the evidence is clear and convincing "will be disturbed only if [any challenged] finding is 'not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).' *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 478, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984)." *In re Luis C.*, supra, 166.

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. *In re Michael M.*, [29 Conn. App. 112, 121, 614 A.2d 832 (1992)]; *In re Megan M.*, 24 Conn. App. 338, 342, 588 A.2d 239 (1991); *In re Davon M.*, 16 Conn. App. 693, 696, 548 A.2d 1350 (1988). We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached; *Pandolphe's Auto Parts, Inc.* v. *Manchester*, [supra, 181 Conn. 222]; nor do we retry the case or pass upon the credibility of the witnesses. *In re Christine F.*, 6 Conn. App. 360, 366–67, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986). Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. *State* v. *Jones*, 205 Conn. 638, 660, 534 A.2d 1199 (1987). *In re Kezia M.*, 33 Conn. App. 12, 16–17, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993). *In re Felicia D.*, 35 Conn. App. 490, 499, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994)." (Internal quotation marks omitted.) *In re Christina V.*, supra, 38 Conn. App. 220.

Our rules of practice require that "[a] summary of the facts substantiating the allegations of the petition shall be attached thereto and shall be incorporated by

reference." Practice Book § 1041.1 (2), now Practice Book (1998 Rev.) § 32-1 (b). There was such a summary attached to each petition, which is approximately eighteen pages and not only lists reasonable efforts the department claimed were made but also contains the following statement: "On 3/28/95, the Department of Children and Families reviewed the entire matter and concluded that every effort had been made to assist in any reunification effort and determined that [Ann F.] is incapable of taking care of these children on a permanent basis." That summary also described Ann F.'s alleged failure to rehabilitate herself as well as the department's position that the children's best interests would be served by the termination of parental rights. The case as to each child was tried, argued, briefed by counsel and decided by the trial judge as to all three issues. It was similarly briefed and argued by the parties in this court.

At the time the petitions were filed, General Statutes (Rev. to 1995) § 17a-112 (d), now § 17a-112 (e), required that "in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding . . . (2) whether the department of children and families has made reasonable efforts to reunite the family pursuant to the federal Child Welfare Act of 1980, as amended . . . ."[24] As we previously stated, the trial court was to apply the clear and convincing standard of proof in considering this requirement.

Against this background, we turn to the issue of whether the trial court properly concluded that the

---

[24] The legislature amended subsection (b), now (c), of § 17a-112, effective in October, 1995, to require the court to find that the department made reasonable efforts to reunify the child with the parent before granting a petition to terminate parental rights. See Public Acts 1995, No. 95-238, § 3. We do not view that amendment as affecting our analysis or the requirement of subsection (d) (2), which was in effect at the time the petition was filed.

department proved by clear and convincing evidence that it made reasonable efforts to reunite the children with their mother. We determine that the trial court's conclusion was improper as to both Eden and Joann.

Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word "reasonable" nor the word "efforts" is, however, defined by our legislature or by the federal act from which the requirement was drawn. We recognize that "[i]n construing language of the General Statutes, the 'commonly approved usage' should control. General Statutes § 1-1 (a). *Caldor, Inc.* v. *Heffernan*, 183 Conn. 566, 570, 440 A.2d 767 (1981)." *State* v. *Antrum*, 185 Conn. 118, 122, 440 A.2d 839 (1981). "Where a statute does not define a term, it is appropriate to look to the common understanding expressed in the law and in dictionaries." *Doe* v. *Manson*, 183 Conn. 183, 186, 438 A.2d 859 (1981). "The words of a statute are to be interpreted in their natural and usual meaning unless the context indicates that a different meaning was intended." *Brown* v. *New Haven Taxicab Co.*, 92 Conn. 252, 254, 102 A. 573 (1917); see *Whitfield* v. *Empire Mutual Ins. Co.*, 167 Conn. 499, 505, 356 A.2d 139 (1975).

Our Supreme Court has said that "[r]easonable is a relative term which varies in the context in which it is used, and its meaning may be affected by the facts of the particular controversy. 36 Words & Phrases (1959 Sup.). It is also synonymous with [e]quitable, fair, just. Webster, New International Dictionary (2d Ed.); *Thompson* v. *Beacon Valley Rubber Co.*, 56 Conn. 493,

498, 16 A. 554 [1888]. *E. M. Loew's Enterprises, Inc.* v. *Surabian*, 146 Conn. 608, 612, 153 A.2d 463 (1959)." (Internal quotation marks omitted.) *State* v. *Antrum*, supra, 185 Conn. 122. In employing that definition for the purpose of deciding whether the department did make reasonable efforts, we do not overlook the requirement that the department, in carrying out the public policy set forth by the legislature, must sustain not only what can fairly be called the ordinary plaintiff's burden of proof but that of clear and convincing proof. It must be acknowledged that in matters of termination of parental rights, the department occupies a superior position. As one court realistically noted, "[t]he parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency in contrast is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory . . . ." *Matter of Sheila G.*, 61 N.Y.2d 368, 381, 462 N.E.2d 1139, 474 N.Y.S.2d 421 (1984), quoting *Matter of Sydney*, 84 Misc. 2d 932, 934, 377 N.Y.S.2d 908 (1975). We hasten to add, however, that while a higher burden of proof rests on the department, reasonableness is an objective standard; see *Phillipe* v. *Thomas*, 3 Conn. App. 471, 475, 489 A.2d 1056 (1985); and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. In our view, reasonable efforts means doing everything reasonable, not everything possible. On the other hand, such efforts should not make it impossible to attain reunification in a given case.

We begin our analysis of the reasonable efforts issue by turning first to certain statements of the trial court that we cannot accept because of the inadequacy of the record. It was not until after its original memorandum of decision was filed that the trial court, in response to

motions filed by Ann F. claiming that the memorandum of decision "[made] no mention of whether or not [the department] made reasonable efforts to reunite either child with her parent," became specific about times and persons in that regard. Both in its August 26, 1996 memorandum on the motion to reargue and in its November 27, 1996 articulation, the trial court said, "A review of the file reflects that reasonable effort findings were made in this case by *McWeeny, J.,* on March 12, 1993; by *Goldstein, J.,* on October 21, 1993, and again while this case was pending on April 6, 1995. In addition, the statute that requires the finding, specifically § 17a-112 (d) (2), was specifically addressed in the court's memorandum of decision on pages 8 and 9." With reference to the trial court's conclusion that reasonable effort findings were made in this case on March 12, 1993, October 21, 1993, and April 6, 1995, we note first that there are no such findings in the file to assist us and, second, that the only reference to them arises from docket entries that are hardly adequate as findings of reasonable efforts if that is in fact what they are suggested to be.[25] It is fair to assume that the trial court in some sense relied on the docket entries in its "reasonable efforts" conclusion. Therefore, we reject any trial

[25] The March 3, 1993 docket entry is titled "Judicial 10 day OTC [order of temporary custody] re: Eden. Reasonable efforts to prevent or eliminate the need for removal of said child from the home were not possible. Affidavit signed on 3-12-93 at ex parte OTC hearing by Judge R. McWeeny." There is no such affidavit in the record before us.

The October 21, 1993 docket entry is titled "Adj. 6 Dispo By Nolo plea children adjudicated neglected—injurious living conditions. Committed to [department] for statutory period. Expectations set for mother. Reasonable efforts were made by state. T. P. due 10-30-93."

The April 6, 1995 docket entry is titled "Jud. Extension of Comm. Eden & Joann Publication on father confirmed. In accordance with agreement of parties on 3-2-95. Extension of commitment granted for state, period effective 4-21-95. Expectations approved. Reasonable efforts for reunification are made. T. plan due 4-30-95. Goldstein, J."

Each one of these three rulings, even if we assume that they go to reasonable efforts to reunify, hardly serves as "specific findings of fact to determine

court suggestion or determination that any one of these three docket entries constitutes "reasonable effort findings" that we must accept as such.

An examination of the trial court's articulation discloses that it essentially did not set out any new facts that were not in its original memorandum. The trial court did, however, in the "Disposition" portion of its memorandum of decision, acknowledge its obligations pursuant to § 17a-112 (d), to make certain findings prescribed by that statute. It made in seven numbered paragraphs its findings under the seven subsections of § 17a-112 (d), including that required by § 17a-112 (d) (2) concerning "reasonable efforts [made by the department] to reunite the family . . . ."[26] It is the duty of the trial judge to set forth the basis of his decision. *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 543, 651 A.2d 1302 (1995).

Thereafter, Ann F. filed a motion to reargue that pointed out, inter alia, another portion of the relevant statutory scheme that had been amended by Public Acts 1995, No. 95-238, § 3, which required that the court find that the department made "reasonable efforts to reunify the child with the parent . . . ." The motion asserted that § 17a-112 (d) (2) was to the same effect, that there had been evidence on this issue at the trial and that the trial court's memorandum of decision "makes no

the basis of the court's ruling." *State* v. *Rios*, 30 Conn. App. 712, 715, 622 A.2d 618 (1993).

[26] That finding stated the following: "The court finds that the department of children and families has made reasonable efforts given the situation and circumstances to provide counseling for Ann, which she has continuously utilized. Efforts to reunite the child Eden with Ann were made in February, 1995. The child was subsequently removed in March, 1995. Even the mother agreed that Eden was too difficult for her to control. The department has unintentionally allowed an inordinate period of time, three and one-half years, for Ann to acquire the skills and stability to effectively parent these children. The mother simply does not have the intellectual or emotional wherewithal to raise these two children."

mention of whether or not [the department] made reasonable efforts to reunite either child with her parent." In its written memorandum of decision on this motion to reargue, the trial court said, inter alia, that this had been addressed in its original memorandum of decision and it specifically set out its finding there, as quoted above. Ann F. made still another motion for articulation, which included questions as to whether the trial court had found that the department had made reasonable efforts to reunify Eden and Joann with their mother and, if it did, whether the department had so demonstrated as to each child by clear and convincing evidence. The trial court's written memorandum of decision in response to this motion stated that it had so found by clear and convincing evidence that the department had made reasonable efforts as to both Eden and Joann. Significantly, the trial court also said that it made these findings after its review of its "decision *as a whole*." (Emphasis in original.) It is evident, therefore, that the trial court addressed the reasonable efforts issue. We, however, do not agree with its conclusions on that issue with reference to either Eden or Joann.

In determining whether the reasonable efforts conclusions are supported by clear and convincing evidence, we first must recognize that this burden applies to Eden and Joann individually. Next, the application of the clear and convincing standard of proof requires some comment about the approbation given this standard in its judicial object of reducing the risk of error where it applies. "There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value [as a natural parent whose parental rights are sought to be terminated] this margin of error is reduced as to [her] by the process of placing on the other party the burden of

producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of [its entitlement to such termination]." *Speiser* v. *Randall*, 357 U.S. 513, 525–26, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958). "The United States Supreme Court has repeatedly noted that 'a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *Schlup* v. *Delo*, 513 U.S. 298, 325, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), quoting *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) [(Harlan, J., concurring)]; see also *Addington* v. *Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)." *Williams* v. *Commissioner of Correction*, 41 Conn. App. 515, 524, 677 A.2d 1 (1996), appeal dismissed, 240 Conn. 547, 692 A.2d 1231 (1997). Our Supreme Court has also noted that "[t]he function of the burden of proof employed by the court is to allocat[e] the risk of error between the litigants and indicat[e] the relative importance of the ultimate decision. *Addington* v. *Texas*, [supra, 441 U.S. 423]. . . . *Cookson* v. *Cookson*, 201 Conn. 229, 234, 514 A.2d 323 (1986)." (Internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 422, 678 A.2d 1338 (1996). "[T]he choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each." *In re Winship*, supra, 397 U.S. 371 (Harlan, J., concurring). We believe that the lower standard of more probable than not "reflect[s] the view that the 'social disutility' of an erroneous decision in either direction is comparable." *State* v. *James*, supra, 237 Conn. 423, quoting *In re Winship*, supra, 397 U.S. 371. On the other hand, we believe that the stringent requirement of clear and convincing proof, which deliberately shifts the risk of an erroneous decision, reflects the view that it is much

worse to make an erroneous decision in favor of one party than it is to make it in favor of the other.

The trial court acknowledged that it was required "to find by clear and convincing evidence (1) that [the department] has made reasonable efforts . . . to reunify the child with the parent . . . ." We conclude that on the basis of the evidence before it, the court could not have made such a finding as to either child. The department, in its pretrial memorandum, stated: "On June 6, 1994, [the department] began to implement an 'extensive multi-phase plan' to reunite [Ann F.] and her children." The verb "implement" has been defined to mean "[t]o carry out . . . accomplish, fulfill . . . to give practical effect to and ensure of actual fulfillment by concrete measures." Webster's Third New International Dictionary. It is not sufficient that the department had perhaps "made a decision [in 1994] as to which child to return." We submit that on June 6, 1994, the department did not begin to implement what it calls an "extensive multiphase plan" as claimed nor on this record did it have such a plan to reunite Eden and Joann with their mother. A plan is "a method of achieving something: a way of carrying out a design."[27] Id.

When Eden was returned, the department had not determined or actually set in place significant elements of a plan. The reunification initially lacked planning on a number of critical issues, including Eden's schooling, respite for Ann F., the crisis telephone line and therapy for Eden, among others.

Specifically, the department was aware that there were outstanding issues with the Manchester board of education that needed to be resolved before Eden could attend school in her mother's town. Rather than wait for the resolution of these issues, the department removed

---

[27] We realize that a plan to reunify a child or children with parents must vary with the circumstances.

Eden from the school in the town of her foster family and placed her with her mother where Eden ultimately did not attend school for nearly the duration of the reunification.

By not planning for Eden's schooling, the department required Ann F. to care for Eden twenty-four hours a day for three weeks straight without a break. The department did not provide respite for Ann F. as part of a reunification plan. About three weeks into the reunification, Ann F. gave herself a few hours apart from Eden. Ann F. went to a neighborhood bingo game with her friend and left Eden in the care of two men. Her friend also left her child in the care of these men. Ann F. hardly knew one of the men, and the two men appeared to have consumed beer while babysitting. That incident in particular seemed to induce the department to end the reunification. The department, however did not engage in any apparent investigation of this incident. Moreover, the department admits no harm came to the children as a result of this incident. Where a child with the needs of Eden is involved, occasional respite for the sole caretaker is critical to maintaining a good relationship. Reasonable efforts to reunify Eden with her mother should have included a plan for respite, especially when Eden was out of school during nearly the entire reunification.

The crisis telephone line set up by the department as part of the reunification plan was, in effect, nonexistent. The department staff waited five days to respond to an urgent crisis line call from Ann F. The crisis telephone line seems to have operated no differently from the noncrisis department telephone line. The crisis telephone line utterly failed to meet its apparent purpose of providing Ann F. with rapid communication with the department staff.

The reunification plan does not appear to have taken into account the fact that Eden was without individual therapy for three months before the reunification. Therapy was not resumed until some time in March, 1995, after Eden was returned to her mother.

The department's efforts to reunify a child with Eden's needs without school or therapy in place for the child and without an operational crisis telephone line or respite in place for the parent were unreasonable. Furthermore, the department returned Eden even before obtaining the results of an ongoing, comprehensive evaluation of Eden it had requested from PEDAL. Had the department waited for the evaluation before returning Eden, it could have used the evaluation's recommendations in properly planning for the reunification. The evaluation was not completed until over a month after the department ended the reunification.

The trial court's finding that the department worked with "other service providers" hardly constitutes the specific findings called for concerning this reunification plan. To suggest that the department had such a plan at the time of reunification was certainly not found by the trial court. The closest any statement by the trial court comes to this required threshold element is its statement that "[i]n late 1994 and early 1995, the department worked with other service providers to reunify Eden with her mother." There is no finding of who these other service providers were or their expertise, or of the degree of services any of them were providing. While there were a few services in place, we submit that this reunification plan did not fulfill the reasonable efforts requirement of § 17a-112 (d) (2).

Turning specifically to Joann, we have no problem in concluding that the department did not sustain its burden of proof that reasonable efforts were made to

reunite Joann with her mother. The trial court's conclusion that the department had proven by clear and convincing evidence that it had done so is totally unsustainable on this record. Any fair view of the evidence clearly demonstrates how far short of the clear and convincing standard that proof as to Joann fell. The record is nearly bereft of evidence of efforts to reunite Joann with her mother. It is not only a question of the quality of the evidence on this branch of the matter, but also that of the quantity of such evidence. We recognize that it appears that Joann has very few, if any, of the difficulties presented by her half-sister, Eden. Thus, it does not follow that if Ann F. had trouble with Eden, she would also have trouble with Joann. It is apparent that Joann's individuality figured minimally and only conditionally in the implementation of the reunification effort that Crosby said was "planned and monitored." The department was waiting to see how Ann F. fared with Eden. If she did well, then Joann possibly would become active in the plan. When Crosby was asked if Ann F. was found to have "the ability to parent Eden, then you [the department] would determine that she [Ann F.] had the ability to parent Joann?" he answered candidly, "But we were going to consider returning Joann." The "Summary of Facts to Substantiate the Petition for Termination of Parental Rights" authored by the department and attached to the petitions states, "If this two month [returning Eden to Ann F.] trial was successful *then strong consideration* would be given to returning the youngest child, Joann, home." (Emphasis added.) It is not out of context to say that this futuristic avowal is as good as it got for Joann. This "plan" consigned Joann to an uneasy limbo in the process. There is simply no evidence of what actual planning had been done, if any, to facilitate Joann's return to her mother. It is hardly an answer to say that there had been some overnight visitation

because the department's position appears to have been that if Eden's reunification with Ann F. failed, then the department apparently had no meaningful plan to make "reasonable efforts," under its statutory obligation, to reunify Joann with her mother.

We are aware that this statutory duty imposed on the department is an aspect of the state's role as parens patriae. We are also aware that the legislature's inclusion of the reasonable efforts requirement in the statute made it the public policy of the state in this type of involuntary proceeding to terminate parental rights. This legislative pronouncement gives the department a public role in private family matters. In sum, the trial court improperly found that the department had proven by the required standard that it made "reasonable efforts" to reunite Joann with Ann F. This conclusion brings to mind the observations of a recognized commentator in the area of children's rights: "Despite the development of the *parens patriae* doctrine which afforded *protection* to children, the actual termination of a parent's rights to his or her children was unknown to the common law. Termination is a creature of state statutes. Without such a statute, there can be no termination of parental rights. It is therefore essential that a parental termination can be decreed only in both strict and literal compliance with the applicable state statutes, for without such legislation, the power of a juvenile (or other) court to terminate parental rights would not exist." (Emphasis in original.) 3 D. Kramer, Legal Rights of Children (2d Ed. 1994) § 28.01, p. 4. Unfortunately, strict and literal compliance with the applicable statute did not occur here.

As pointed out above, our function on review is to determine whether the court's conclusion is legally correct and factually supported. *In re Christina V.*, supra, 38 Conn. App. 220. In applying this standard we give full play to the province of the fact finder to determine

credibility. Where the burden of proof required at the trial is enhanced over that of a fair preponderance to that required in this type of case—clear and convincing evidence—the application of this stricter standard is still considered as a purely factual challenge. A legal sufficiency challenge to fact finding requiring that it be by clear and convincing evidence does not dictate a different standard of review. In reviewing the action of the trial court, we are aware that with petitions to terminate parental rights, "[t]he rights to conceive and to raise one's children have been deemed 'essential' . . . basic civil rights of man . . . and '[r]ights far more precious . . . than property rights . . . .'" (Citations omitted.) *Stanley* v. *Illinois*, supra, 405 U.S. 651. Furthermore, as the *Santosky* court stated, " 'If the State prevails [in a parental rights termination proceeding], it will have worked a unique kind of deprivation [of a fundamental liberty interest]. A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.' " *Santosky* v. *Kramer*, supra, 455 U.S. 759, quoting *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). In requiring clear and convincing evidence, *Santosky* also said that "[f]or the child, the likely consequence of an erroneous failure to terminate is preservation of an uneasy status quo. For the natural parents, however, the consequence of an erroneous termination is the unnecessary destruction of their natural family." *Santosky* v. *Kramer*, supra, 765–66.

We conclude that the trial court's findings (1) that the department made the statutorily required reasonable efforts to reunify Eden with her mother and (2) that the department made the statutorily required reasonable efforts to reunify Joann with her mother are not supported by clear and convincing evidence.

The judgments are reversed and the cases are remanded with direction to render judgments dismissing the petitions.

In this opinion the other judges concurred.