Memorandum of Decision On Disposition as to Dorothy I.
This is a coterminous petition for the youngest child, Grace, and a regular petition for the termination of parental rights for the older children, Charles, Eric and Collin, to terminate the rights of their parents, Dorothy I., Vernon I. and and Charles A. The case was tried over five days beginning March 2 and ending on March 6, 1998. On March 9, 1998, this court entered a Memorandum of Decision finding that the youngest child Grace had been neglected in that she had been abused, and further finding that grounds existed to terminated the parents rights, and entered a disposition terminating the parental rights of the children's fathers. The court reserved decision on the disposition of the mother, Dorothy, I.
The evidence clearly and convincingly established that Grace's father, Vernon I., had fractured this child's arm. Further, the mother, Dorothy I., had failed to protect the child, and when she learned of the fracture, the mother failed to secure medical treatment for the child. The child remained in long term pain from March 23, 1998 until April 2, 1998. When the injury was anonymously reported to the police, the mother told the police on April 2, 1997, that there was nothing wrong with the child. The police officer observed the infant was crying "a strong, intense, painful cry." The left arm was swollen and deformed and the child was not moving it. Both parents were arrested for risk of injury to a minor child.
This was not the family's first involvement with DCF. On March 26, 1993, a referral came to DCF that Vernon I., the husband of Dorothy had struck the two children Charles and Eric, leaving bruises on them and that domestic violence was an issue within the family. (Exhibit # 29). Another referral to DCF occurred in July, 1994 regarding the child Eric's medical diagnosis of failure to thrive. Another referral in March of 1995, concerning the medical neglect of the children in that mother had missed two of Eric's medical appointments.
On April 15, 1995, the older children Charles C., Eric and Collin were brought to St. Francis Hospital. The children were examined and found to have numerous injuries and bruises, which, according to the physician, Dr. Hamid Feroze, were not CT Page 6412 accidentally inflicted . . . the injuries were consistent with being hit by a blunt instrument. The injuries were in various states of healing, suggesting they had occurred at various times. The children's mother could not give an adequate or clear answer to questions regarding the injuries. She denied that the husband inflicted them and denied that there was any domestic violence in the home, when asked directly by the DCF caseworker. In a statement made to the police in 1997, the mother admitted that her husband would ". . hit and abuse the children. He would hit them with shoes and belts and his hands. He would cause welts black and blues. He would spank Collin who was about 2 months at that time on the buttocks." (Exhibit # 11). The children were removed from the home.
Between April, 1995 and February, 1997 the children were out of the home in foster care. Dorothy and Vernon began a family reunification program at Catholic Family services in July, 1996. The couple actively participated in this program. Dorothy and Vernon lied to the counselors repeatedly about the nature of the problems in the home and never reported the on-going domestic violence. In January, 1997, DCF proposed a plan to reunify the children to the home, due to the very favorable recommendation of Catholic Family Services counselors. Dorothy declined the offer to have homemaker services assist her, especially in light of her then pregnant state. Eric and Collin were reunited on February 7, 1997, and Charles on February 14, 1997. "On February 25, 1997 all three children were again removed from the [house] due to noncompliance, primarily on the part of Vernon I.
During the next four weeks, Vernon and Dorothy went out of state to New York for the birth of Grace. They did not want DCF to know of the birth. Vernon told the DCF worker that they were going to Jamaica for the birth. Within the month after the removal of the three older children, Grace was born and her arm was fractured.
Dr. Betty Spivak, an expert in pediatrics with a specialty in abused and neglected children, testified. She indicated that these children are in high risk of injury if returned to Dorothy. She testified that forty percent of children who die of neglect and abuse injuries die within the first year. Another forty percent die within three years and virtually all abuse and neglect deaths occur within six years of birth. Grace especially remains at high risk considering, the age at which the first injury occurred, three weeks: the severity of the injury, a CT Page 6413 fracture; untreated for seven to ten days. In a setting where the parents attempted to hide the birth, a truthful history was not provided and they indicated to the police they were going to go to Jamaica. Dr Spivak was not impressed by the mother's claim of manipulation and control by her husband. She testified the risk to the child remains high. She testified to the fact that repeated abusive relationships are not uncommon and to the adult who is subject to abuse, the domestic violence abuse victim is more likely to be an abuser herself. "The lack of care for an infant in pain raises severe questions regarding the culpability of the non-abusing spouse." The fact that Dorothy and Vernon are married makes the risks higher, she said. It is more difficult to get out of the relationship, Dorothy had not demonstrated any sign of having rejected Vernon for all his abuse. "I presume he won't be incarcerated for life without parole," she concluded.
Dr. Robert Meier, a licensed clinical psychologist, testified that the prognosis for reunification was poor. The children distrust their mother, Grace is very attached in her foster home, Charles primary attachments are to his siblings, all of the older children are in need of long term therapy, with academic and clinical intervention. Dr. Meier indicated that it was unlikely that either parent could sufficiently overcome their respective problems within a reasonable amount of time.(Exhibit # 28).
The thrust of the respondent mother's case contests, not the the Adjudication, indeed her own statement to the police (Exhibit # 11) confirms the neglect and abuse of her children, (See also her admissions to her own evaluator John Peter Bermon, Exhibit # A.), but rather, she contests the Disposition of the case. Her argument is that she has rehabilitated herself subsequent to her 1997 incarceration.
She was in York Correctional Center for six months after her arrest on April 2, 1997, until September, 1997. She is presently in a shelter. It is undisputed that Dorothy has been in various individual and group programs to better understand herself; her past and her present. (See various Respondents exhibits. Also testimony of Donna Corrangello and Willa Edwards).
In order for the court to have a very current assessment of her psychological profile, the court, following the testimony in March, entered the following order: CT Page 6414
"The court will continue the matter of Disposition as to Dorothy until April 27, 1998 at 10:00 AM. or such other early date as is convenient to counsel and Dr. David Mantel. The court orders that the present psychological condition of Dorothy I. is to be evaluated by Dr. David Mantell. The court directs that Dr. Mantell provide his usual thorough psychological evaluation and in addition to consider the following questions:
A. Does Dorothy I. fully understand the dynamics of abusive relationships and in particular the dynamics of her relationship with Vernon I.?
B. Does Dorothy I. have the ability to relate to the children; to empathize with the children and to assist in their healing?
C. Should the children be treated differently in terms of permanency planning, especially Grace, based upon his evaluation, the social studies, Dr. Meier's report, Dr. Spivack's report, the evaluation of Dorothy I. and the fact that Dorothy I. does not have any existing parent/child relationship with that child?
D. What is the likelihood that Dorothy I. will enter another abusive relationship?
Upon receipt of the report of Dr. Mantell, the trial will resume for the purpose of entering a disposition regarding Dorothy I."
On April 17, 1998 Dr. David Mantell, a licensed clinical psychologist, known to the court and the lawyers, testified that he had examined Dorothy on April 7 and 9, 1998. His report was entered into evidence as Courts Exhibit # 1. He was examined by the court and by counsel. His analysis of the facts contained on page two of his report, very succinctly and accurately captures the factual history of this case. In his testimony and in his report, he frequently resorts to the term "severity and chronicity of the abuse in this case." It is a theme that has been directly or indirectly cited by various physicians and clinicians. The court feels compelled to pay heed to the warning. The safety of these children is paramount. This mother has failed to demonstrate over a period of years that she can protect her children, provide for their regular medical care, feed them, and keep them safe. CT Page 6415
In response to the court's questions, Dr. Mantell does not support the mother's claims of rehabilitation. Notably, he finds that she does not have a good understanding of the dynamics of abusive relationships. Further, she is ". .emotionally chronically damaged person with evidence of personality disorder and below average intellectual functioning." These findings add further support to the findings of the other experts, that returning these children to Dorothy would place the children at risk of further abuse and neglect.
In each of the histories taken of Dorothy, violence is portrayed as a way of life. She learned from her brothers to fight, to be tough. She describes herself as having been a wild person who intended to fight her husband. She is not only a victim of violence, but also a perpetrator of violence Dr. Spivack, without knowing her personal history, projected that possibility. "The pattern of the mother's life abundantly illustrates the nature of the problems at hand." (Court's Exhibit # 1 p. 8)
The court is aware that DCF has made mistakes in this case in failing to treat Dorothy as a victim of domestic violence. See, David J. Henning Inclusion of the Reasonable Efforts Requirementin Termination of Parental Rights Statutes: Punishing The ChildFor the Failures of the State Child Welfare System, 54 U.Pitt. L. Rev 132, 143 (1992). These mistakes, however, do not defeat the proposition that reasonable efforts at reunification were made. In the first instance, counseling services were provided. Other, in home services were offered, but refused. The children were actually reunited with their parents, seemingly a requirement by the court in In Re Eden F. Et al 48 Conn. App. 290 (1998), although that is not a requirement under federal law.
The reunification was not successful. It was not successful because nothing had changed. The parents had lied to the counselors and had not, in fact rehabilitated themselves. They had masked their problems. DCF had provided services designed to rehabilitate the parents and further reunification efforts. The service provider had concluded that the out come of counseling was favorable. DCF, acting in good faith in accordance with its state and federal mandate, attempted a reunification. Thereafter, a subsequently born child is tragically abused.
Children are not trophies to be awarded to unfit parents upon CT Page 6416 some failing or perceived inadequacy of the child protection agency. This court must consider the entire context of the shortcoming, giving due consideration to the parent's legal rights and, importantly, not disregarding the protection of the children.[2]
Mandatory Findings:
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e):
1) The timeliness, nature and extend of services offered. The court finds that counseling services, individual and group were offered, Homemaker services were offered but declined, visitation was offered and foster care was provided by DCF. See paragraph 15 of exhibit # 29.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980[3]. See discussion of this issue earlier. The court concludes that DCF did comply with the act, in that they prepared and implemented a reunification plan, and provided services to facilitate reunification.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that court approved expectations were given to the parents on April 23, 1996. The parents did not act in good faith in attending counseling but not disclosing the problems in the home. Further, the parents failed to meet expectations in that the abused a subsequently born child, Grace, and failed to provide her with prompt medical attention. This episode resulted in their arrest, a violation of the expectation that they avoid further involvement with the criminal justice system.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that the children may be bonded to their present foster families, but that any presently existing emotional bonds, with their mother or with their foster parents will, unfortunately be broken when the children are placed for adoption following this termination of the parents rights.
5) As to the age of the children. The children are eight, CT Page 6417 five, three and one years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD),189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In reAlexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD (1979).
6) The efforts the parent have made to adjust their circumstances or conditions. The court finds that the parents actively sought to deceive the service providers by failing to disclose the dysfunction, abuse and violence within the household. The mother's claim of rehabilitation is not clinically supported and, to the extent she has made some personal rehabilitation, it is fragile and not sufficient to overcome the risk of harm to the children. The father has consented to the termination of his rights.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the child. There was no unreasonable conduct noted by DCF as it relates to the children's relationship with their parents. The parents did attend visitation with regularity.
 DISPOSITION
Based upon the foregoing findings, the court determines that it is in the children's best interest for a termination of parental rights to enter with respect to the mother Dorothy I. and accordingly a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive families. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file reports as are required by State and Federal law.
Francis J. Foley, Presiding Judge