MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Maryann T. and Luis G., who are the biological parents of the minor children, Adelina and Luis. They were born on March 7, 1984 and June 20, 1991, respectively. The children are presently fourteen and seven years of age. There is another sibling, Lisette, who is presently thirteen years of age who is not involved in this case. The Commissioner of the Department of Children and Families ("DCF") brings this petition for termination for parental rights on behalf of the oldest child and the youngest child only.
The Commissioner has elected to pursue long term foster care for the middle child, Lisette, since she appears to be the most academically gifted of the three children. She is in a foster home that is secure and nurturing, but the foster parents cannot CT Page 11362 afford to send Lisette to college. Under existing regulations and policies, DCF can provide and pay for a college education for certain foster children. In light of the ability of the Commissioner to pay for college, and considering the wishes of the foster parents, and the child's wishes to remain with the foster parents and to attend college, the Commissioner has made a decision that permanent foster care with the present foster parents is in Lizette's best interest and, accordingly, DCF has not pursued a termination of the parental rights as to Lisette. This child is not before this court. The court notes that, in any event, each child is to be evaluated individually in termination of parental rights cases. In Re Eden F., 48 Conn. App. 290, 315
(1998).
The parents have been served, they have actual notice of the pendency of the proceedings. Counsel have been appointed to represent the parents. The attorneys have met with their clients and appeared on behalf of the parents at trial. The court has jurisdiction in this matter; there is no pending action affecting custody of the children in any other court.
A Consent to Terminate Parental Rights was filed by the children's father, Luis G., at the commencement of trial. His consent was found to be voluntarily and knowingly made with the advice and assistance of competent legal counsel and with a full understanding of the consequences of his consent. He and his counsel were excused from the remainder of the three day hearing which commenced on August 18, 1998.
On April 20, 1992, the Commissioner filed a petition in the Superior court alleging that Adelina was uncared for in that the mother was unable to meet the child's needs, that the father was incarcerated for sexually abusing Adelina, and that the child had been placed in a psychiatric hospital to deal with her significant behavioral and emotional problems. The child was adjudicated to be uncared for on July 15, 1992. Since her commitment to the Commissioner, Adelina had eight foster homes, three hospitalizations, and one residential placement. Within the community of social workers, this phenomenon is called "foster care drift." The adoption Assistance and Child Welfare Act of 1980 was enacted to prevent this kind of languishing foster care. The respondent/mother wants these children to continue in foster care.
Luis G. is a seven year old child (DOB 6/20/91) who was CT Page 11363 removed from the care of his mother when she signed a voluntary placement agreement. On January 5, 1995, DCF filed a petition in the Superior Court alleging that the child was beyond the control of the mother and that the father had not had any contact with the child since May, 1994. Luis was committed to the care and custody of the Commissioner as an uncared for child on February 3, 1995.
After providing counseling to the child, Luis, and to the mother, a reunification was attempted on May 29, 1996. Within five months, DCF confirmed that the mother was not able to handle this five year old child. She hit the child in the mouth and threatened to kill him with a knife. He was admitted to a children's psychiatric hospital. With the exception of that five month reunification attempt, Luis has been in the care and custody of the petitioner since July 1, 1994, when he was three years of age.
On Sept. 7, 1994, Expectations were prepared and signed by the mother. (Exhibits #17 and 18). The Social Study (Exhibit #1) narrates in great detail the history of personal and parental failures of Maryann and her inability to integrate and implement appropriate parenting skills. While Maryann did make efforts to fulfill the counseling requirements, this unfortunately presents a case where her own personal lack of parenting, her own emotional and intellectual limitations, and her own inability to understand the needs of children at various developmental stages prevent her from ever effectively parenting. Her parental limitations are greatly magnified by the fact that these children require above average parenting skills.
Maryann is now thirty-two years of age. She is the seventh of eight children born to her parents who met while institutionalized at Southbury Training School. She had a chaotic childhood which included two three-year periods of foster care. In addition, Maryann was hospitalized at Altobello Psychiatric Hospital as a teenager. Maryann dropped out of the ninth grade at age seventeen. She has never been married, nor has she ever been employed.
 She has a long history of psychiatric difficulties and social service involvement dating back to her childhood. She was reported sexually abused by a maternal uncle and claims not to remember much about her childhood. She describes her family as dysfunctional, stating that her parents often fought. . . . She CT Page 11364 reportedly has a learning disability and . . . she has subsisted on disability income most of her life. (Yale Child Study Center — Exhibit #3 p. 4)
The social study further indicates that Maryann has had a long history of emotional and mental health problems. She "suffers from panic attacks, phobias, depression and anxiety and these symptoms have interfered with her parenting ability and capability to gain insight into her children's special needs. In November of 1994, Ms. [T.] was psychiatrically hospitalized due to a suicide attempt. Ms. [T.] continues to receive in home psychiatric nursing services and outpatient, individual mental health counseling." (Exhibit #1 p. 7).
Maryann met Luis, the children's father, when they were seventeen and eighteen years old respectively. Within the year she was pregnant with Adelina. The child was born on March 7, 1984. When Adelina was one month old she suffered a skull fracture and DCF (then known as the Department of Children and Youth Services) became involved with the family. In April, 1989, Yale-New Haven Hospital confirmed findings consistent with Adelina's claim that she had been sexually abused by Luis, her father. Maryann was then pregnant with Luis, Jr.. Around this time, Maryann learned that Luis had married another woman. Luis was subsequently convicted of sexually assaulting Adelina and was incarcerated.
On April 20, 1992, a petition was filed by DCF on behalf of Adelina. The allegations were that the mother was unable to meet the special needs of the child and the child was placed in a children's psychiatric hospital due to her significant behavioral and emotional problems. The child's father was then imprisoned. Maryann signed a voluntary placement agreement and the child has been out of the home since she was first hospitalized on September 17, 1991.
 Ms. [T.] retained custody of all three children until December, 1991 when Adelina was hospitalized and discharged to foster care four months later. During this hospitalization, it was noted that, although compliant with efforts at parent guidance regarding management of Adelina's problematic behavior, Ms. [T.] had significant difficulty in learning and utilizing positive behavior management strategies. This finding has since been noted repeatedly as indicated by reports from service providers. (Report of Yale Child Study Center, Exhibit #3 P. 5, 1997).
CT Page 11365
Luis was born on June 20, 1991. On January 5, 1995, a petition was filed by DCF claiming that Luis had special needs that could not be met in the home. The mother had signed a voluntary placement agreement. On February 3, 1995, Luis was committed to the care and custody of the Commissioner. On May 29, 1996, Luis was returned to the care of Maryann. On September 10, 1996, four months after Luis was returned to Maryann's care DCF confirmed that Maryann had hit Luis in the mouth and threatened to kill the child with a knife.
 She admitted that raising the children as a "single parent" had been difficult and she often had to "turn herself in." She added that she had once threatened to kill Luis, but denied actually intending to hurt him. "I was stressed. I know it was wrong. He [Luis] stressed me out." Ms. [T.] denied ever having been physically aggressive with the children by stating, "No! I may have hit them once in a while, but I never left bruises." (Report of Yale Child Study Center, Exhibit #3 p. 7, 1997).
Dr. Annette Madrid, the psychiatrist at the Yale Child Study Center wrote a report and testified in court. She noted that Maryann had limited comprehension and frustration tolerance causing her to "misconstrue Luis' developmentally appropriate bids for autonomy and to perceive him as overly-active, defiant and demanding." Dr. Madrid evaluated many service providers' reports, clinical reports, and social studies. She personally interviewed the children's mother, Maryann, her boyfriend, Rob, the three children, Adelina, Lisette, and Luis, and she interviewed the foster parents. She spent over six hours interviewing the parties between March 27, 1997, and June 3, 1997. In addition, she spent time reading all the reports and writing her own report which she submitted to the court on June 19, 1997. The court was very impressed with her expertise and her ability to understand and articulate the issues. Her recommendation was as follows:
 A wealth of historical data, as well as current observations, indicates that reunification of Adelina, Lisette and Luis with their biological mother, Ms. [T.]. would not serve any of the children's interests. I recommend that Adelina, Lisette and Luis remain in their current placements on a permanent basis.
The mother, through her attorney, argues that this result can be accomplished through long-term foster care placement and that CT Page 11366 it is unnecessary to actually terminate the mother's parental rights. The court rejects this argument. First, Dr. Madrid, in her recommendations indicates what the court has often heard:
 [M]aintaining Lisette, Adelina and Luis in permanent foster care deprives them of the opportunity for a secure and stable family life. Ms. [T.'s] visits to them have been disruptive. I strongly recommend terminating Ms. [T.'s] and Mr. [G's] parental rights to all three children so that they can be freed for adoption. (Exhibit #3 p. 16).
The court was very impressed with the testimony of the psychiatrist and the psychologist and accords their testimony great credibility. In Re Kezia M., 33 Conn. App. 12, 22 (1993).
Second, the children are extremely conflicted by their continuing exposure and ties to the mother. The social worker reports that "Adelina continues to struggle with the loyalty conflict of wanting to please her mother and be with her although she knows her mother cannot properly care for her. Adelina has a strong attachment to her foster family and she wants to grow up in their home." The evidence further indicates that Adelina feels responsible for her mother. In one report the psychologist, Dr Paul Krubiner, indicates that Adelina is physically very mature and appears older than her age, yet she is three years behind educationally and placed with other children that are three years younger than she. She is in a group labeled Seriously Emotionally Disturbed. She is taking Prozac for her depression.
 Adelina will need long term psychotherapy to address her therapeutic concerns. She also requires a family environment that provides a high degree of stability, nurturance, and security. At the same time she needs a home that provides clear limits and consequences. Adelina clearly has emotional conflicts with her birth mother. She experiences tremendous guilt and conflict regarding loyalty toward her birth mother and at the same time has tremendous anger and resentment regarding her inability to care for her. . . . After visitation with her birth mother Adelina was frequently depressed, agitated, moody, and resistant. I believe that the . . . visits stirred up all of Adelina's anxieties regarding her therapeutic issues. (Exhibit #19).
Dr. Krubiner, the therapist for Adelina and Luis, further indicates that Maryann's visits "tend to increase [Luis'] CT Page 11367 anxiety, insecurity, and sense of instability and his behavior frequently deteriorates after the visits. Again, [in the] long term, Luis requires a family structure that provides large doses of stability, security, a high degree of structure, and clear and appropriate consequences for his behavior. (Exhibit #11).
These children will not receive a high degree of security and structure in the home of Maryann. It is apparent from the testimony of the respondent mother, her appearance in court, and her demeanor and expressions that she is only marginally able to care for herself. In order to provide emotional security for her in court, she received permission to have her "live-in fiancee," Rob, sit with her during the trial. While she was on the stand testifying, the attorney for the petitioner asked her if she was the victim of domestic violence in her home. This question by the Assistant Attorney General was prompted by the noticeable ecchymosis around Maryann's eye. Maryann said she was not going to answer the question. She said that the black-eye was a result of her boyfriend accidentally hitting her in the eye while he was sleeping. When asked if she ever abused the children, Maryann said she never left bruises on them, she said she always would seek help when she abused them. At this point in her testimony, she became distraught and was permitted to end her testimony.
It is clear to the court that Maryann loves her children and, on some level, the children reciprocate. In some cases, these facts alone would militate against a termination of parental rights as in the case of In re Migdalia M., 6 Conn. App. 194,207-208, 504 A.2d 532 (1986).
 If, however, the parents of a child with developmental disabilities have parenting limitations but love their child, consistently express an interest in the child's welfare and periodically visit with the child committed to foster care, parental rights should not be terminated, since the situation affords the child both the consistency of foster parenting and the relationship with natural parents.
This case differs from Migdalia in two very important ways. First, while the children have affection for their mother, they know that she can never parent them. The psychiatric testimony is that this causes the children great anxiety and prevents them from firmly attaching with their foster families. Second, the children know that their mother does not consistently support the plan of foster care, she says bad things about the foster CT Page 11368 parents, and she undermines the stability of the foster home by keeping alive the fantasy that most children have to be reunited with their biological parents. The court finds that Maryann's involvment with these children is unsettling to the children and prevents progress in their therapy.
Counsel for the mother called as her witness Lois Luciani, a social worker at Casey Family Services, the agency directly providing the foster care and therapy for these children. Among other things, Ms. Luciani indicated that Luis has recently told her that he knows his mother cannot care for him and he wants to stay in the present foster home. She testified that both children know that a judge is going to make a decision in this case. Ms. Luciani said that in October, 1997, after Adelina had a conversation with her mother, Adelina's conduct began to deteriorate. She said that Adelina does not wish to hurt her mother's feelings and she doesn't want to hurt anyone. Adelina knew her mother was tearful and unhappy and was saying bad things about the foster parents. It is clear to this court that the children are in a dreadful state of divided loyalty and anxiety caused by the conduct of their mother. The mother's presence in the lives of these children is a source of turmoil and insecurity for both Adelina and Luis. The court agrees with the recommendation of the psychiatrist and the psychologist that these children should not be burdened by a belief that they had anything to do with the judge's decision. These children know that their mother cannot care for them. It is likely that they are unsettled every time a social worker comes to the door by the fleeting thought that they may be removed from the home.
Adelina has had suicidal ideation, she is significantly depressed, she is classified in school as "Seriously Emotionally Disturbed," and these "therapeutic issues are exacerbated by adolescent issues of independence, autonomy and sexuality." (Exhibit #19). According to Dr. Krubiner, Adelina needs long term psychological therapy and a family environment that "provides a high degree of stability, nurturance, and security." Dr. Krubiner further observes that "[A]fter visitation with her birth mother Adelina was frequently depressed, agitated, moody and resistant."
Counsel for the respondent mother claims that the court committed error in not allowing Adelina to be called as a witness. The court indicated that it would be guided by the evidence and the testimony of the child's therapist. Dr. Krubiner's report of June 20, 1998, deals specifically with this CT Page 11369 issue.
 It is my understanding that Adelina may be requested to testify in an upcoming Termination of Parental Rights (TPR) trial. I am strongly recommending that Adelina not be subjected to testifying. Adelina already feels extreme guilt, conflict, and anxiety regarding her birth mother issues and her testimony in court is very likely to exacerbate her levels of depression, anxiety, and moodiness. I believe that such action will be detrimental to Adelina's well being. (Exhibit #19).
In his testimony in court Dr. Krubiner said it would be horrible if Adelina thought that she had something to do with this decision. She is fourteen, she's three years behind in her grade level, she has talked about suicide. "Nina would be relieved that somebody else made the decision for her. She does not believe her mother can care for her." The court finds that a socially and emotionally disturbed child with significant mental health problems, who is very conflicted about her relationship with her birth parent and her foster parents, who exhibits "tremendous guilt and conflict," as in this case, should not be called to testify. In re Lauren R., 49 Conn. App. 763, 779
(1998). There was ample testimony by the guardian ad litem, the social workers and therapists, as well as statements from the child's attorney, that Adelina has, on occasion, expressed a wish to return to her mother's care, notwithstanding her correctly held belief that "her birth mother will [n]ever be able to care for her." The court is well aware of Adelina's and Luis' stated preferences.
All this is not to say that Maryann is "at fault" or "a willful failure" at rehabilitation. It is not the trial court's obligation to assign fault or blame in determining whether to grant a petition to terminate parental rights. In re Luis C.,210 Conn. 157, 168 (1989). Neither does the compliance or non-compliance with expectations, in themselves, resolve the issue. Further the court is aware that "the statute does not require that a parent must either assume a full time responsibility for a child's care, or suffer a termination of parental rights." In re Migdalia M.,6 Conn. App. 194, 206, 504 A.2d 532, (1986). But where, as here, the peripheral presence of the birth mother, who will likely never be able to assume a parental role, creates guilt, conflict, and anxiety in the minds of the children, a termination of the parental rights may be the appropriate resolution to free the CT Page 11370 children from that emotional burden.
 ADJUDICATION
With respect to the statutory grounds for termination of parental rights the court finds by clear and convincing evidence that on July 5, 1992, Adelina was adjudicated to have been uncared for and that on February 3, 1995, Luis was adjudicated to have been uncared for. The court further finds the mother, through no fault of her own, has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children that she could assume a responsible position in the life of these children. General Statutes § 17a-112(c)(3)(B).
The court finds that these grounds have existed for more than one year.
 Mandatory Findings:
With respect to the mandatory factual findings required by General Statutes § 17a-112(e): [findings are not required for the consenting respondent/father.]
1) The timeliness, nature and extent of services offered. The court finds that parental, psychological and psychiatric services were offered, visitation was offered, and foster care was provided by DCF. Beginning in 1992, a parent aide was provided, parenting classes were offered, in-home intensive reunification services were offered. Later DCF attempted reunification for the child Luis. This reunification concretely demonstrated the mother's complete inability to effectively parent her children. The five year old child became uncontrollable by the mother who then resorted to violence and death threats to attempt to secure submission by the child.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. The mother has had enough time to demonstrate her parental fitness and to achieve rehabilitation. The mother of the children was offered services but has failed to rehabilitate or achieve satisfactory parenting skills. The services offered were accessible, available, and appropriate.
3) The terms of applicable orders entered into and agreed to CT Page 11371 by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did fulfill or comply with the expectations described more fully in the social study. The issue was not whether mother attended and completed the counseling and therapy, but rather whether she benefitted [benefited] and was able to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children that she could assume a responsible position in the lives of these children. The court finds that she did not attain such a degree of personal or parental rehabilitation.
4) The feelings and emotional ties of the child with respect to the mother and foster parents, etc. The court finds that the children are bonded to their present foster families, they consider themselves part of their families. The court finds that the children do have a relationship with their mother that produces guilt, anxiety, and conflict for them. Both children are dealing in therapy with feelings of loss for her mother.
5) As to the age of the children. The children are fourteen and seven years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD), 189 Conn. 276
(1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . . ." In re AlexanderV., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, Joseph Goldstein, et al., Beyond the Best Interests of the Child
99 (1979).
6) The efforts the parents have made to adjust their circumstances or conditions. The court finds that the mother has been unsuccessful in her rehabilitative efforts. She has attempted rehabilitation but she is unable to protect herself or the children in harmful situations. She is easily overwhelmed and uses physical discipline or violence rather than behavior modification techniques that she has been taught. (A) Mother has maintained contact with the children fairly consistently. (B) As far as is known, neither parent has had any communications with the foster parents. Mother undermines the foster parents in her conversations with the children.
7) The court finds that there has been nothing to prevent the mother from maintaining a meaningful relationship with the CT Page 11372 children. There was no unreasonable conduct noted by DCF.
 DISPOSITION
The court finds, based upon the testimony and evidence presented, that it would be in the children's best interest to terminate the parents' rights at this time. This finding is made after considering the children's sense of time, their need for a secure and permanent environment, the relationship that the children have with their foster parents, and the totality of circumstances. In re Juvenile Appeal (Anonymous), supra,177 Conn. at 667-68. See generally, J. Goldstein, et al., Beyond theBest Interests of the Child 99 (1979).
Based upon the foregoing findings, a termination of parental rights shall enter with respect to the mother Maryann and the male biological parent Luis G. by his consent. Accordingly, a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Francis J. Foley, Presiding Judge Child Protection Session