Memorandum of Decision
This is the tragic case of two little boys separated from their parents as a result of a combination of factors, including abandonment, neglect, poverty, homelessness, and the failure of systems originally designed to protect children, but have, instead become major contributors to the suffering experienced by them. Michael H. was born on June 1993 to Connie D. and Michael D. His younger brother Marquille D., was born two years later on July 1995. For a variety of reasons that will be explained in detail further in this decision, Michael and Marquille entered into the care of the Department of Children and Families (DCF) on November 19, 1998.
On April 23, 2001, DCF filed a petition to terminate the parental rights (TPR) of Connie D. and Michael D. to their two children, Michael and Marquille. DCF alleges that Connie and Michael have abandoned their children in the sense that they have each failed to maintain a reasonable degree of interest, concern, or responsibility as to their welfare. General Statutes § 17a-112 (j) (3) (A). In addition, DCF alleges that in a prior proceeding the children have been found to be neglected and Ms. D. has failed to rehabilitate. General Statutes § 17a-112
(j) (3) (B1). DCF also alleges that there is no ongoing parent-child relationship between Michael and his children and that it is not in the children's best interest to allow additional time for such a relationship to develop. General Statutes § 17a-112 (j) (3) (D).
The court finds that notice of this proceeding has been provided in accordance with the practice book. Ms. D. was served in hand on April 28, 2001. Because Michael's last known address was in Haiti, the Court ordered notice to him by publication. His plea date was extended to November 19, 2001. A notice appeared in the Haiti-Observateur, a newspaper of general circulation in Haiti on November 14-19, 2001. On CT Page 12721 November 19, 2001, in view of Michael's failure to appear at the hearing, the Court (Dennis, J) entered a default. On June 18, 2001, this case was referred to the Child Protection Session in Middletown for purposes of hearing the contested trial.
On December 20, 2001, pursuant to Practice Book § 34-1 (c), this court appointed an attorney to conduct a diligent search for the father. On January 22, 2002, the attorney filed an Affidavit of Diligent Search with the court. The affidavit listed the many efforts made by the attorney to locate the father in Norwalk. Because all of the information in the file pointed to the fact that the father was no longer in Norwalk due to action taken by the United States Naturalization and Immigration Services, the Court found the search unreasonable and ordered a second search. A second affidavit was filed by the attorney on February 12, 2002 and accepted by the court on February 13, 2002. The father was not found and has never appeared before the court.
The trial of this matter was held on February 13 and 14 and on June 10, 2002. The court was presented with seventeen (17) full exhibits and heard the testimony of six (6) witnesses. The court finds the following facts based on the direct evidence and reasonable and logical inferences drawn therefrom. The court has also taken judicial notice of the court file in its entirety.
 I FACTUAL FINDINGS
A. THE MOTHER, CONNIE D.
 1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF FEBRUARY 4, 1998.
Ms. D. was born in Connecticut on September 12, 1972. She is presently thirty years old. She is the biological mother of two children, both of whom are the subjects of this petition. At age twenty-one she delivered her first child, Michael, followed by Marquille when she was twenty-three. According to the social study,[2] she was married to Michael D., the father of her children and lived with him until July 1995, the day that Marquille was born. On that day, Michael was arrested for the sale of drugs, incarcerated and turned over to the United States Immigration and Naturalization Services. He was deported to Haiti at that time.
At twenty-three, Ms. D. was a single mother of a two year old and a newborn. As she struggled with meeting the responsibilities associated CT Page 12722 with single parenthood, on January 17, 1997, she came to the attention of DCF.[3] Someone had called the DCF Hotline to report that Michael and Marquille were home alone.
DCF investigated the call and assessed the situation as serious enough to invoke a ninety-six hour hold.[4] Pursuant to its statutory authority, DCF removed the children and placed them in foster care. The police were also called to the scene and Ms. D. was arrested for Risk of Injury to a Minor and Reckless Endangerment. Her criminal record[5]
shows that she was convicted of these charges on October 8, 1997 and sentenced to one year of imprisonment, suspended, with a two year period of conditional discharge.[6]
On January 22, 1997, four days after invoking the ninety six hour hold, DCF filed a petition alleging that the children were neglected. The petition was accompanied by a request for an ex-parte order of temporary custody (OTC).[7] The Court did not grant the application for the OTC, which meant that the children were returned to Ms. D.'s care, while the petition remained pending in court.
The court file reveals that while the petition was pending during the year 1997, at least four hearings were held in the Superior Court, however, it was not until the expiration of thirteen months after the filing of the petition, that the children were adjudicated neglected. The memoranda of these hearings[8] indicate that Ms. D., through counsel, was unwilling to agree to DCF's demand of a commitment of the children; she was requesting a trial to allow her an opportunity to contest the case. The memorandum of the hearing held on October 16, 1997, indicates that Ms. D. arrived late for the hearing and as a result, the matter was continued until November 19, 1997. The purpose of the next hearing was listed as an in court review (ICR). On November 19, 1997, since no agreement had been reached, the case was assigned for a contested trial to begin on February 4, 1998.
On that date, Ms. D. entered a nolo plea to the allegation that the children were neglected children. The court adjudicated the children as neglected children and permitted them to remain in Ms. D.'s custody with a six month period of protective supervision.[9] The Court also ordered Ms. D. to comply with a set of expectations to "improve your chances of regaining or permanently keeping custody of your child."[10]
The court heard testimony from Ms. Janet Lyons, a DCF social worker supervisor who was assigned to the case in May 2001.[11] According to the testimony of Ms. Lyons, during the thirteen months that the neglect petition was pending in court in 1997, DCF referred Ms. D. to a variety of CT Page 12723 service providers to address the issues that presumably led Ms. D. into the world of the child protection agency. These services included referrals for parenting classes, through an organization known as Impairment of Children at Risk, as well as evaluations to determine if drugs or alcohol were problems in the case. During this time period, Ms. D. was assigned a DCF case worker, Michelle Costello, who made the referrals and worked with her from January 31, 1997 through February 24, 1998.[12] This social worker did not testify during the trial of the petition to terminate parental rights. Ms. Lyons, however, testified that Ms. D. cooperated with the drug and alcohol evaluation in 1997. She testified that "Drug and alcohol use has not been issue in this case."[13]
Unfortunately for the children, prior to the trial of the pending neglect petition they were once again the subject of a call to the DCF Hotline. This call was made in December 1997 and contained allegations that the children were left alone while mother drove a cab in the evenings. The caller also alleged that Michael had been hit and "was seen walking to the store without shoes on or a coat and it was in December."[14] DCF attempted to investigate the complaint, however, they were unable to locate Ms. D. or the children. Ms. Lyons further testified that on one occasion, an effort was made to locate Ms. D. at a particular address that had been given to DCF, but the effort was unsuccessful. DCF also attempted to locate Ms. D. at a motel in Stratford, and this search was also unsuccessful. Since contact was not made with Ms. D. at this time, DCF was unable to substantiate this call.
Ms. D. testified that after the first Hotline call was made to DCF in January 1997, she "had to move from where I was living at, . . . in Bridgeport . . . and I had no place to go, so I moved to a Norwalk Shelter."[15] DCF was finally able to connect with Ms. D. on the trial date of February 4, 1998. It was then learned that, in fact, Ms. D. and the children were living at a shelter in Bridgeport.[16]
 2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF FEBRUARY 4, 1998 AND PRIOR TO THE EXPIRATION OF THE SIX MONTH PERIOD OF PROTECTIVE SUPERVISION ON AUGUST 8, 1998.
As stated earlier, the Court (Arnold, J) adjudicated the children neglected on February 4, 1998 and allowed the children to remain in Ms. D.'s custody under a six month period of protective supervision. The Court advised Ms. D. of its expectations of her and continued the matter until May 20, 1998. The purpose of that next hearing was to review Ms. D's progress with the expectations and to assess the overall situation. CT Page 12724
It is noteworthy that, at the point in time that the period of protective supervision commenced on February 4, 1998, despite the child protection agency's involvement with Ms. D. for thirteen months, she was still homeless, living in a shelter and was in an even more precarious position, having been convicted as a felon in October 1997 for charges stemming from leaving the children home alone. Moreover, several weeks after the commencement of the period of protective supervision, on February 24, 1998, Ms. D.'s case was transferred from social worker Michelle Costello to Benjamin Ohene who remained on the case for six months; to August 13, 1998. This, of course, meant that Ms. D. would have to once again begin the process of `meeting and connecting' to a social worker to assist her in retaining custody of her children.
It appears as if this new worker, Benjamin Ohene, was assigned to work with Ms. D. exclusively during the six month period of protective supervision. Although Mr. Ohene did not testify during these proceedings, Ms. Lyons, testified regarding the efforts DCF made to provide case management services as well as to monitor compliance with the expectations of the court during the period of protective supervision. Ms. Lyons further testified that it was not until two months after protective supervision had been ordered that the new worker attempted to meet with Ms. D. By that time, according to Ms. Lyons, Ms. D. had left the shelter with the children and had moved to an apartment in Norwalk. This time, DCF referred Ms. D. for parenting classes through the YWCA.
When the Court issued its expectations of Ms. D. on February 4, 1998, it advised Ms. D. that it expected her to comply with a number of steps including "allow social worker access to home weekly, participate in counselling (sic): Parenting Individual, mother and children to work with the ECAR program-mother to allow ECAR worker in home, secure/maintain adequate housing and income, no substance abuse, no involvement with the criminal justice system, mother to participate in psychological eval and follow recommendations, [and] when mother is not available must have proper daycare [and] she must provide names of providers and dates she used them."[17] Pursuant to General Statutes § 46b-129 (j), the Court expected DCF to supervise compliance with the conditions it had established.
On May 20, 1998, the date that the court had previously established for an in court review of the period of protective supervision, the Court was advised that Ms. D. and the children had moved to Norwalk and the case was to be transferred from the Bridgeport court to the Norwalk court.[18]
There was no status report nor update provided to the court by DCF, other than that the case was to be transferred to Norwalk because Ms. D. no CT Page 12725 longer lived in Bridgeport. There is no indication in the court file, nor was evidence presented during the (TPR) trial, that the matter was ever reviewed by a court, in Norwalk or anywhere, prior to the expiration of the period of protective supervision on August 4, 1998.
Since no request for an extension of the order of protective supervision was made to the court, nor did the court request an update on the status of Ms. D. and the children, the legal status of protective supervision expired by operation of law on August 4, 1998. This did not mean, however that life was in any way moving along smoothly for Ms. D. and her children.
Ms. Lyons further testified that during this time period, DCF referred Ms. D. for a psychological evaluation. Ms. Lyons testified, however, that she did not have any records indicating whether or not Ms. D. ever attended an evaluation. This meant that DCF did not know if any recommendations for possible treatment had been made by the psychologist or the mental health professional to whom Ms. D. had been referred. DCF also did not know whether or not Ms. D. was in compliance with any of the other conditions set by the court or even if the order of protective supervision had expired. When questioned about this time period, Ms. Lyons stated: "It's not clear that it did expire. I mean, I know that there was a date for it to expire, but that was when the case went from Bridgeport to Norwalk and it's unclear. I wasn't able to establish whether protective supervision actually expired."[19]
 3. EVENTS FOLLOWING THE EXPIRATION OF THE SIX MONTH PERIOD OF PROTECTIVE SUPERVISION ON AUGUST 4, 1998.
Unfortunately, what was quite clear was that the situation for Ms. D. and the children was not improving. She and the children were still at a shelter in Norwalk in late August when they were once again the subject of a DCF Hotline call. The shelter called DCF stating that Ms. D. had slapped a child of a fellow tenant at the shelter and was hospitalized at the Norwalk Hospital for anxiety.[20] Pursuant to its statutory responsibility, DCF responded to the call to investigate. The investigation did not result in either a ninety-six hour hold nor in an ex-parte application for an OTC. Following Ms. D.'s overnight stay at the hospital, she returned to the shelter with the children still in her care and custody. The social worker assigned to help Ms. D. during this critical time of emergency hospitalization, homelessness and single parenthood of two small children, offered Ms. D. "parenting classes through NEON", despite Ms. D.'s request for assistance with housing.[21]
Ms. D. was told that DCF does not supply housing "that we would hook her up with Ms. Ruthie Brown at NEON who could help her . . . apply for CT Page 12726 housing."[22] The record is silent as to any referral for mental health treatment to address the anxiety for which Ms. D. was hospitalized.
Ms. D. was eventually forced to leave that shelter because of numerous infractions stemming from her assaultive behavior. DCF was successful in locating another shelter for Ms. D., however it was in New Haven. This meant that the children would have to adjust to another school in another town. Ms. Lyons testified that Ms. D. did not want them to have to experience further change in their lives. She did not want to "disrupt the children's schooling."[23] Ms. D. chose not to go to the New Haven shelter.
 4. EVENTS FOLLOWING THE VOLUNTARY PLACEMENT AGREEMENT OF NOVEMBER 19, 1998.
Despite her efforts to support herself and her two children on her own, and to keep the children in her care, on November 19, 1998, the circumstances in Ms. D's life had unraveled to the point that she approached DCF to ask for help. Since she could not find adequate housing and she wanted her children to remain in the Norwalk school system, she was forced to place her children with DCF under a Voluntary Placement[24]
According to DCF regulations,[25] the voluntary services program is designed to preserve and enhance family relationships. The regulations set forth the admission criteria which a family must meet in order to qualify for admission into the program.[26]
In connection with the voluntary placement, Ms. D. testified that "when Trevor Johnson took my kids from me, I didn't know where they was (sic) at for, like, two, three months . . . He just said that there was a lady in Norwalk that was willing to take both of them."[27] She went on to testify that she was not allowed to visit with the children while they were under the voluntary placement, but only started telephone contact with them in February 1999. No explanation was ever given for Ms. D's statement that she did not visit the children during the period of the voluntary placement. In response to a question during cross examination regarding whether or not social worker Trevor Johnson arranged for a meeting between the mother and the potential foster mother prior to placement, Ms. Lyon's responded: "I don't recall that, no."[28]
 5. EVENTS FOLLOWING THE OTC OF MARCH 19, 1999.
Despite the statutory scheme of referring voluntary admissions to the Probate Court after the expiration of one hundred twenty days for a determination as to whether continuation in care was in the children's best interest, DCF applied for and obtained an ex-parte OTC in Superior CT Page 12727 Court on March 19, 1999. The basis for the OTC, was homelessness. In addition, DCF filed a neglect petition alleging that the children were neglected and uncared for. During direct examination, Ms. Lyons was asked why DCF applied for an OTC in March 1999, given that the children were in DCF's care pursuant to a voluntary agreement. Ms. Lyons testified "I didn't see that it's very clear in the record. It's just that we were concerned because she didn't-wasn't displaying that she could provide for the children."[29]
At the mandatory ten day hearing on March 29, 1999, the OTC was sustained by agreement. In addition, the Court ordered specific steps,[30] and continued the case to April 26, 1999, the plea date, to confirm whether or not timely notice by publication had been given to the non-appearing father. On this date, the Court accepted DCF's representation that notice had in fact been published, and the Court entered a default against the father, without prejudice.
The specific steps issued in March 1999, included orders that Ms. D. attend a psychological evaluation and follow any treatment recommendations made by the evaluator. The steps also required Ms. D. to attend parenting classes. The steps are silent, however, regarding the name of the provider of those parenting classes or the treatment goals of the parenting classes. The steps also required Ms. D. to secure adequate housing. It is noteworthy, that despite the fact that the children were not in Ms. D.'s care or custody, the specific steps required Ms. D. to keep their whereabouts known to DCF. The steps also required Ms. D. to consistently meet and address the children's needs and to immediately notify DCF of any changes in the composition of her household to ensure that the change would not compromise the health and safety of the children. The steps were also silent regarding visitation.
Ms. D. testified that at some point in May 1999, she started an open visitation process with the children in the home of the foster parent. According to Ms. D., this open visitation continued through 1999 and 2000. "[A]s the months went by, she was allowing me to take the kids on the weekends . . . I use to pick them up either Friday or Saturday and bring them back Sunday . . . It was a good relationship . . . She was allowing me to take them to the movies, to dinner."
That open and flexible visitation was taking place while the OTC was in effect was corroborated by the testimony of Ms. Lyons in response to questions during cross examination. Ms. Lyons testified that visitation was taking place between the mother and children "but it varies in the record. But there were times when she would visit them anywhere from three to four times a week . . . there was on incident that she had — I CT Page 12728 don't know if she actually drove them, but she took them to school."[31]
It is important to note, that when the court ordered Ms. D. to comply with the specific steps on March 19, 1999, the day it issued the ex-parte OTC, it also issued specific steps to DCF. The form entitled specific steps, stated that "DCF is ordered to: (1) Take all necessary measures to ensure the child (ren)'s safety and well being; (2) Provide case management services; (3) Develop periodic treatment/permanency plan and review it with the Respondent; (4) Refer the Respondent to appropriate services (see above) and monitor his/her progress and compliance; (5) Monitor the welfare of the child (ren) and the circumstances surrounding his/her/their care by the Respondent, (6) In a Domestic Violence case, assist in developing, implementing and monitoring an appropriate safety plan."[32]
In accordance with the specific steps, on May 26, 1999, Ms. D. was evaluated by the court appointed evaluator, Dr. RJ. Rosado, who administered a series of tests designed to measure cognitive skills as well as personality and interpersonal skills. From the results of the intelligence tests, Dr. Rosado concluded that Ms. D. was functioning in the Borderline Range to the Mild Level of Mental Retardation. He also found that she was suffering from a great deal of anxiety and confusion. His report to the court stated that "Despite her transient episodes of doubt, anxiety, and confusion, [Ms. D.] strives to maintain the children's best interests at heart. It is believed that this characteristic allowed her to seek to have the children remain in foster care, until she is capable of caring for herself and them."[33]
Dr. Rosado recommended that Ms. D. be referred for "a Psychiatric Consultation to recommend treatment for anxiety [and to] receive a Neurological Evaluation to assess her report of migraines and determine whether there is neurological impairment from her past automobile accidents (where she experienced head injuries)."[34] Dr. Rosado further recommended that Ms. D. be referred to a case management or parent mentoring program.
For the next nine months the neglect petition remained pending in court. The children remained in foster care pursuant to the OTC. The evidence before this Court to indicate what efforts were made by DCF to address the recommendations made by Dr. Rosado regarding case management services, is very limited and contained in a statement made by Ms. Lyons during cross-examination.[35] There is evidence, as stated previously, that Ms. D. enjoyed a good relationship during a significant portion of this time with the foster mother and would visit the children in the foster home on a frequent basis. In fact, Ms. D. further testified that CT Page 12729 she would visit the children in the home on a daily basis after school. There were times that she and the foster mother would go out together with the children.
This extensive amount of contact between Ms. D. and her children continued until October 2001, when an incident occurred between Ms. D. and the foster mother's fiancee, who was babysitting for the children at the time. An incident occurred, which will be explained later in this decision, which resulted in the arrest of both Ms. D. and the babysitter. The visitation schedule changed after this event. Dr. Rosado testified that a notable element in his evaluation of Ms. D. was "the most significant strength, is that she is a well intentioned parent who always looked out for their best interests."[36]
 6. EVENTS FOLLOWING UNCARED FOR ADJUDICATION OF DECEMBER 20, 1999.
On December 20, 1999, Ms. D. entered a nolo plea to the pending neglect and uncared for petition on the grounds of homelessness. The court accepted the plea and committed the children to DCF for the next twelve months. The court also entered orders regarding specific steps that Ms. D. needed to take to regain custody of her children. The Court used the same form of the specific steps ordered in March, 1999, however it made certain substantive changes, before signing and dating the form.[37]
The court ordered Ms. D. to participate in a psychiatric consultation for anxiety as well as in a neurological evaluation. The court also crossed out the word `psychological' from the previous order directing Ms. D. to obtain a psychological evaluation and inserted the words `psychiatric and neurological.' The court also ordered that Ms. D. visit with the children as often as possible. The court also crossed out those steps suggesting that Ms. D. was required to keep the whereabouts of the children known at all times, as well as the step requiring Ms. D. to meet the needs of the children while they were in foster care, as well as the step that required Ms. D. to inform DCF if Ms. D. should experience a change in the composition of her household. The court then reaffirmed all of the other steps previously entered on March 19, 1999.
On March 27, 2000, three months following the uncared for adjudication, and twelve months following the children's entry into the foster care system pursuant to an OTC, DCF filed a motion asking the Court to review its permanency plan for the children. The plan called for reunification of the children with the mother. At the hearing on the permanency plan, held on April 10, 2000, the Court approved the permanency plan of reunification and ordered DCF to file a motion for revocation of commitment and a new permanency plan no later that October 16, 2000. The Court also requested an update on the status of the neurological and the CT Page 12730 psychiatric examinations. The case was continued to May 15, 2000 for receipt of the reports of the evaluations.
According to the evidence presented in this trial, Ms. D. participated in a neuropsychological examination with Dr. Robert P. Tepley. He issued his report on August 16, 2000,[38] fifteen months after Dr. Rosado had initially issued his findings and recommendations regarding the need for an individual psychiatric evaluation and an individual neurological evaluation. In his report, Dr. Tepley addressed the issue raised by Dr. Rosado concerning a possible traumatic brain injury: "Certain examination findings are consistent with acquired neuropsychological deficits secondary to traumatic brain injury."[39] He cautioned that Ms. D. demonstrated a "severely limited capacity to self-direct or self-monitor her own behavior and cognitive processes . . . The patient is unlikely to become genuinely engaged in a long-term psychotherapeutic relationship."[40] He also stated that his findings were consistent with a diagnosis of anti-social personality disorder.
No reason was ever given to explain why DCF referred Ms. D. for a neuropsychological evaluation instead of a neurological examination and a psychiatric examination, which is what Dr. Rosado recommended and the specific steps ordered. Ms. Lyons was asked during cross-examination about the referral for a psychiatric examination and she admitted that the referral had not been made "until recently."[41] The clear and convincing evidence is that Ms. D. was finally evaluated by Dr. David A. Krulee, a psychiatric evaluator, on January 11, 2002, two and a half years after Dr. Rosado originally made the recommendation.[42]
The evidence reveals that the social worker assigned to Ms. D. during this time period, Trevor Johnson, started his work with Ms. D. on August 13, 1998 and ended his involvement with her on June 29, 2000. According to the documentation presented by DCF at trial,[43] as well as the testimony of Ms. Lyons, a new social worker, Michael Clark, was assigned to Ms. D. on July 10, 2000, from which the Court infers that for eleven days no worker was assigned to this case. Mr. Clark testified that he had a Bachelor's Degree in Psychology and had worked for DCF for "[one] year, eleven months and four days." He also testified that, prior to becoming a social worker, he had been employed as an intern to a school psychologist.
Michael Clark testified that when he was first assigned the case, the first thing that he did was meet with his supervisor to be brought up to date on the status of the case. He reviewed the transfer summary as well as the recent narratives in the DCF file. He then called Ms. D. who responded to him on August 1, 2000. An appointment to meet was scheduled CT Page 12731 for August 2, 2000. According to Mr. Clark, Ms. D. called him on August 2, to inform him that she would not be able to make the appointment.
He told her that, notwithstanding her request to reschedule the appointment, they would have to meet on that day. He told her that he would meet her that afternoon at three o'clock. The meeting was to be held in a parking lot at the Motor Vehicle Department at Ms. D.'s request. Ms. D. did not attend the meeting. Mr. Clark called her on August 7, 2000 to impress upon Ms. D. that it was very important that a meeting between the both of them be set up. He told her that if she were to come to the DCF office at a time when Mr. Clark was not there, she could ask to speak to his supervisor. Ms. D. went to the DCF office on August 10, 2000 and met with Mr. Clark's supervisor.
The court was not presented with any evidence regarding what was discussed or agreed upon between Ms. D. and the supervisor. What Mr. Clark did say was that while he was assigned to the case, he attempted to coordinate visits between Ms. D. and her children at the DCF office because the foster mother had requested a change in the open visitation schedule. Mr. Clark testified that he did not schedule either a psychiatric or a neurological examination as required by the specific steps. In fact, he stated during cross-examination that he was not aware that a psychiatric examination had ever been ordered by the Court.[44]
Mr. Clark further testified that he did not know what the term case management services meant.[45] During re-direct examination, in response to very specific questions posed by the assistant attorney general, however, Mr. Clark clarified that when he is assigned a case he is to "assess the situation, put in services that are deemed appropriate, and to monitor the client's progress with the treatment."[46]
No evidence was introduced to describe the services that Mr. Clark put in place to further the permanency plan of reunification. He did indicate that he checked with NEON, the agency working with Ms. D. to help address her issues. On September 30, 2000 he was informed by NEON that Ms. D. "fails to keep in regular contacts [with] center programs."[47] There is also no indication whatsoever as to what was done by anyone in light of Dr. Tepley's findings.
On October 2, 2000, DCF filed a motion in court seeking approval of the new permanency plan for Michael and Marquille: termination of their parent's parental rights and adoption. On October 23, 2000, the Court approved the permanency plan and entered a finding that further efforts at reunification of Ms. D. with her children were no longer appropriate. The Court advised DCF to file the petition to terminate parental rights no later than April 23, 2001. CT Page 12732
On April 2, 2001, Ms. D., through counsel, filed a motion for revocation of commitment.
7. EVENTS FOLLOWING THE FILING OF THE TPR PETITION ON APRIL 23, 2001.
On April 23, 2001, the TPR petition was filed in Court. Approximately five weeks later on May 31, 2001, a new social worker, Constance Smith, was assigned to Ms. D.'s case. This social worker remained on the case for three months until August 15, 2001, when a new social worker, Michelle Mitchell, was assigned to the file. Ms. Mitchell testified she first met with Ms. D. at a case status conference held in court on September 4, 2001. At Ms. D.'s request, on October 24, 2001, Ms. Mitchell met with Ms. Ruthie Brown, the caseworker from NEON as well as with Ms. D. Ms. Mitchell testified that discussions at that meeting centered on Ms. D.'s dissatisfaction with DCF's level of assistance in obtaining housing, as well as her interest in establishing a visitation schedule with the children. Ms. D. testified that she had been enjoying flexible and liberal visitation with the children in the home of the foster parent until sometime in October 2001, when the policy was changed by DCF and the foster mother. She was most interested in establishing a visitation schedule. According to Ms. Mitchell, a visitation schedule was established at that meeting.
Ms. Lyons testified that on August 17, 2001, four months after the TPR petition had been filed in court, and ten months after the filing of the new permanency plan of a TPR, DCF began communicating with the foster mother about the possibility of an adoption of the children. According to Ms. Lyons, the foster mother was interested in adopting Marquille. Regarding Michael, "She went back and forth because of Michael's behavior. She questioned whether or not she could handle him. But after he started receiving therapy, she said that she did show an interest in adopting both children."[48] The foster mother did not testify at the TPR trial.
At a hearing held on November 19, 2001, the Court (Dennis, J) ordered the children's commitment to be maintained until further order of the court. In addition, since a psychiatric evaluation had never been done, the Court entered another order for the psychiatric evaluation of Ms. D. On December 3, 2001, Ms. D., through counsel filed a motion to transfer custody and guardianship of her children to her parents. On December 20, 2001, that motion was consolidated with the TPR petition. The motion to transfer guardianship was subsequently withdrawn by counsel on the first day of the TPR trial. CT Page 12733
On December 20, 2001, the Court also ordered an updated psychological evaluation of Ms. D. as well as an interactional assessment of her relationship with the children. In addition, the Court ordered an interactional assessment of the relationship between the children and their foster mother. This order was entered in response to a motion filed by DCF and agreed to by all of the parties.
On January 11, 2002, Ms. D. participated in a psychiatric evaluation with Dr. David A. Krulee, a court appointed evaluator.[49] According to his report as well as to his testimony, his evaluation consisted of a review of the history of the file, an interview with Ms. D., a confrontational interview and a mental status examination. The results of these interviews informed his diagnostic impressions from which he rendered his findings and conclusions to the court. He did not administer any particular testing instrument. Dr. Krulee concluded that "Ms. D.'s intellectual functioning is significantly below average but not in the deficient range. The examiner questions the psychological testing results from 1999 as a valid representation of Ms. D.'s current intellectual functioning."[50]
During his testimony, Dr. Krulee explained his reasoning for questioning the validity of Dr. Rosado's conclusions regarding Ms. D.'s intellectual functioning. "I base that on my experience interviewing mentally retarded individuals and people with normal intelligence and my assessment of her vocabulary and cognitive understanding skills. And also, on the fact that the particular instruments that Dr. Rosado chose are not the most widely used commonly employed instruments, the TONI3 and the STIR. You know the standard is the WAIS, the Weschler Adult Intelligence Scale. And you know, if one were to — wanted a more definitive kind of intellectual assessment, the WAIS would be the instrument."[51]
During his testimony, Dr. Rosado explained that the reason that he did not use the Weschler test is that there is a suggestion that the instrument is culturally biased and, "there's some research that indicates that African-Americans do ten to fifteen points lower in their IQ than Caucasian people with the same test."[52] Regarding why he uses the TONI to test nonverbal intelligence, Dr. Rosado explained "I find it preferable for a variety of populations in urban settings, especially if someone has had a poor educational background because their visual, perceptual skills allow them to figure out the answers to these questions despite whatever educational background they have."[53] Dr. Rosado maintained his opinion that the results of Ms. D.'s testing shows that the results obtained in the nonverbal testing indicate that she is in the borderline range of intellectual functioning, while the results obtained CT Page 12734 in the verbal testing indicate that Ms. D. functions in the mentally deficient range.
During his testimony, Dr. Krulee was asked to consider whether or not the explanation for the use of tests that were not commonly used could be, that the examiner considered them culturally sensitive. He responded: "In this context, I'm not an expert in those particular instruments. My points that I make in my report are that, based on my conversation with [Ms. D.] I do not believe she's mentally retarded. I thought she had below average intellectual functioning, but that she wasn't retarded."[54]
Regarding Ms. D.'s psychological functioning, Dr. Krulee concluded that Ms. D., suffers from a personality disorder which he defined as a "deeply engrained (sic) pattern of maladaptive behavior which significantly impacts on a person's life either socially, occupationally, or creates subjective distress."[55] Both Dr. Rosado and Dr. Tepley agree with the diagnosis of personality disorder.
During the TPR trial, Dr. Rosado testified that an updated psychological evaluation for Ms. D. had been scheduled for February 6, 2002 at 10:00am. The interactional evaluation with the children had been scheduled for later on that same afternoon. According to Dr. Rosado, Ms. D. appeared for the appointment and told him that she did not want to talk to him or participate in an evaluation with him. She explained to him that she had just recently found out what the results of her 1999 psychological evaluation were and that she was upset to see that she believed that he had characterized her as mentally retarded. She told Dr. Rosado that she had participated in other evaluations with other professionals associated with the Juvenile Court and they had arrived at different conclusions.
Dr. Rosado also testified that he had "received a call informing me that Michael had been hospitalized and was not available for the evaluation, that he had run away from home . . . which meant that the two interactions that we had scheduled were both cancelled (sic)."[56] In view of Michael's worsening condition as well as the children's attorney request for the updated psychological, this Court ordered that the updated psychological and interactional evaluation be scheduled as soon as possible.
On March 25, 2002, Dr. Rosado conducted an interactional evaluation of both children with the foster mother and the ten year old foster sister.[57] On March 26, 2002, Dr. Rosado updated the psychological evaluation of Ms. D. as well as the interactional evaluation CT Page 12735 of her relationship with both of her children.[58] In addition, Dr. Rosado conducted a psychological evaluation of Michael.[59] Since Dr. Rosado did not conduct an individual evaluation of Marquille, he offered no comments regarding this child's funcitioning. He did testify that Marquille interacted well with both his biological mother as well as with his foster mother.
This court, also ordered Ms. D. to participate in a neurological examination. On February 27, 2002, Ms. D. was examined by a neurologist who found "no clear, consistent evidence of any recognized neurological disorder."[60]
Ms. D. testified that she is presently living in a small apartment and is working driving a cab. Her salary has been garnished in the past for child support payments. She is desirous of having her children returned to her care, because she says, "she loves them unconditionally."
B. THE FATHER, MICHAEL D.
As stated previously, Michael D. has had no involvement whatsoever in the life of his children. As a result of his involvement in the illegal sale of drugs, he was deported to Haiti on the day that Marquille was born. The court was provided with no other information about Michael D.
C. THE CHILDREN
 1. MICHAEL.
Michael was born on June 1993 and is currently nine years old. The evidence clearly establishes that he is a child with profoundly specialized needs that is closely bonded with his biological mother. He has been seriously and permanently emotionally wounded during his short life experience. His story is one that clearly illustrates the human need to connect with one's mother, even if she is unable to meet one's needs. It is important to provide some detail regarding what was happening in the life of the children, especially Michael, during this time.
During the first day of trial, on February 13, the court heard from Dina Pimental, a clinical social worker employed by the Mid-Fairfield Child Guidance Clinic in Norwalk. At the time that she testified, she had been employed with the Child Guidance Clinic since approximately August 2001 and had started working with Michael on August 14, 2001. She stated her credentials to include a master's in social work from the University of Illinois in Chicago. She also stated that she did a year of fellowship training at the Yale Child Study Center. CT Page 12736
Ms. Pimental testified that Michael had been referred to her in connection with an "incident of him (sic) setting fire in his foster home . . . He was physically aggressive. He had been fighting mostly with his sibling, Marquille, and with the other child that is in the home . . . [H]e was irritable. He was having a lot of other behavioral problems. He was destroying property. He seemed somewhat depressed."[61] Ms. Pimental continued by stating that at the beginning of her work with Michael, she did not observe any of the behaviors for which he had been referred. The situation changed, however, on November 25, 2001.[62]
On this day, according to both Ms. Pimental and Ms. Mitchell,[63]
Michael had hallucinated a little man in the closet and became very fearful of going back to his foster home. The foster mother did not know what to do and she called Ms. D.'s parents to see if they could help calm Michael. Ms. D.'s parents put the foster mother in touch with Ms. D. The foster mother asked Ms. D. to come over to help her with Michael. When Ms. D. arrived at the foster mother's home, she was given permission to take Michael out for a while to help him calm down. When she returned with Michael, the foster mother was not home. Ms. D. was greeted by a man who was referred to by Ms. Mitchell during testimony, as the babysitter. He questioned her presence in the house.
Apparently, the foster mother had neglected to inform the babysitter of what had transpired earlier in the day and that Ms. D. had her permission to be in the home. According to the testimony of Ms. Mitchell, on November 25, 2001, Michael ran out of the house and both the babysitter and Ms. D. ran after him. An altercation developed between Ms. D. and the babysitter, a neighbor called the police and Ms. D. was arrested for Risk of Injury to a Minor, threatening and disorderly conduct.[64] The babysitter was also arrested for disorderly conduct. These charges were still pending at the time of this trial.
The following day, on November 26, 2001, Michael was brought to Ms. Pimental's office where efforts were made to help Michael. The results of a mental status exam performed by Ms. Pimental as well as Michael's refusal to leave her office, caused enough alarm to the clinic staff so as to transport Michael by ambulance to the hospital. He was examined and released the next day. He was returned to the home of his foster parents, who returned with Michael to the Child Center Clinic on the very same day that Michael was discharged from the hospital. The foster parents reported that Michael was experiencing the same fears of the day before, and they were at a loss as to what to do. Ms. Pimental attempted to intervene once again, but in view of Michael's refusal to return to the home of the foster parents, she advised them to consult with DCF CT Page 12737 about placement issues.
On November 27, 2001, Ms. Pimental met with the foster mother, her fiancee, her ten year old daughter, Marquille and Michael. The issues surrounding Michael's fears were discussed. Michael remained in the foster home and coped with his fears by sleeping in a room with his younger brother or with the foster mother's daughter. According to Ms. Pimental, her efforts at intervention were working until January 14, 2002.
On that day, Michael's aggressive behavior had escalated to throwing rocks at his younger brother as well as at the foster mother's daughter. What happens next is a fascinating example of Michael's expression of his need for help. He called 911. When the police arrived at the home, he ran out of the home into the street and began to make suicidal gestures. He was brought to the hospital once again, where he was examined and released to the home of the foster parents on the next day.
On January 18, four days later, Michael ran away from the home of the foster parents in search of his mother, at an address where he believed that she may be living. He was found and brought back to the home of the foster parents. Two days later on January 20, Michael again ran away in another attempt to find his mother. He ran to the same location where he had previously run to. This time he found his mother who, to her credit, promptly took him to the police station to notify the authorities that her son had run away from his foster home. Michael was once again returned to the home of the foster parents.
On January 25, 2002, five days later, Michael was scheduled to see his pediatrician. He was expressing a great deal of fear in going to this appointment with his foster mother. He went out of the house and sat in the street causing a disruption in traffic. The police were once again called to the scene. They were able to help calm Michael enough to have him get into the foster mother's car. She took him to the Child Guidance Clinic, where a colleague of Ms. Pimental's worked with Michael and was able to convince him to get in the car to go to the pediatrician. After his appointment with the pediatrician, Michael returned to Ms. Pimental.
Michael's capacity to attach and make connections was displayed in his actions with Ms. Pimental, following his visit to the pediatrician. Despite his emotional pain and anguish, as well as his desire to commit suicide, he wanted to return to school to say goodbye to a teacher who was leaving the school. Ms. Pimental, however, was of the opinion that the actions of the past week were so serious that Michael needed to be hospitalized. She permitted him to go to the school to say his CT Page 12738 farewells. Ms. Mitchell picked him up after school and transported him to St. Rafael's Hospital where he remained for two weeks until February 8, 2002. While at the hospital, he was diagnosed with major depressive disorder and oppositional defiant disorder. When he was discharged from the hospital, he was returned to the home of his foster mother.[65]
Unfortunately for Michael, his condition has continued to deteriorate. During the last day of the TPR trial, Dr. Rosado testified that at the time that he performed his evaluation in April 2002, Michael was in his second inpatient psychiatric hospitalization and "I was deeply concerned because, having worked at an inpatient setting, when I saw Michael he was in . . . profound suffering despite the fact that he had been receiving treatment and was still hallucinating despite the fact that he was on medication."[66]
Michael was discharged from this hospital on June 3, 2002 and transferred to Boys Village.
2. MARQUILLE.
Marquille was born on July 1995 and is seven years old. He was born on the day that his biological father was deported to Haiti. The court was provided with very little information about Marquille. The social study filed on April 23, 2001[67], states that "Marquille is developmentally on track and is up to date with immunizations . . . [he] attends . . . [s]chool and is reportedly doing well and the school has no concerns . . . [h]e has been in the same foster home since 11/19/98 and has a strong bond with his foster family . . . he enjoys watching television and playing video games." In the addendum to the social study filed on February 4 2002[68], it is reported that Marquille was referred for counseling to help him with understanding separation issues.
Ms. Pimental, Michael's therapist testified that she started seeing Marquille after DCF made the referral. At the time of trial she had seen him a total of four times. She stated that she would see the brothers together for therapy "and they really worked well together and seemed to have some of the same issues that they're struggling with and I thought it would be helpful to see both of them together and to determine whether or not Marquille needed an individual therapist."[69] She further testified that she saw Marquille alone on only one occasion.
Because Dr. Rosado never evaluated Marquille individually he was unable to comment on whether Marquille would benefit or suffer detriment from a termination of his mother's parental rights. Regarding the siblings, relationship, however, he was able to say that the brothers "related well CT Page 12739 to each other. They were close as siblings, . . . they spoke easily and comfortably with each other. There were no indications of conflict."[70]
 II ADJUDICATION
"Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights . . . exists by clear and convincing evidence." (Citation omitted.) In re Quanitra M., 60 Conn. App. 96, 102, ___ A.2d ___, cert. denied, 254 903 (2000).
A. REASONABLE EFFORTS TO LOCATE AND TO REUNIFY.
Section 17a-112 (j) (1) of the General Statutes requires the court to find, by clear and convincing evidence that DCF has made reasonable efforts to locate the parent, and that it has made reasonable efforts to reunify the child with the parents.
1. Reasonable efforts to locate.
The court finds by clear and convincing evidence that DCF made reasonable efforts to locate the respondent father. The clear and convincing evidence establishes that the father was deported to Haiti on the day that his son Marquille was born, and that he has not returned to this country. He has had no involvement with any of these court proceedings.
2. Reasonable efforts to reunify.
"To terminate parental rights under § 17a-112 (c), now (j), the department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. In accordance with § 17a-112 (c) (1), the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate." In re William R. III, 65 Conn. App. 538, 546, 782 A.2d 1262
(2001). CT Page 12740
Here, DCF alleges that it has met its burden to provide reasonable efforts to reunify Ms. D. with her children in each of the three ways provided by the statute: (1) that as of October 23, 2000 reasonable efforts were no longer appropriate because on that date a judicial determination was made that such efforts were no longer appropriate, (2) that it has made reasonable efforts to reunify Ms. D. with her children and (3) that Ms. D. is unable or unwilling to benefit from any further reunification services.
a. Prior judicial determination of October 23, 2000.
A review of the memorandum of the court hearing of October 23, 2000, as well as the orders signed by the court on that date, fails to indicate whether or not the finding that reasonable efforts at reunification were no longer necessary, was made by clear and convincing evidence.[71] In addition, the court's order regarding reasonable efforts predated the implementation of P.A. 01-142.[72], which became effective on October 1, 2001, and was thus inapplicable to the case at bar. See In re EdenF., 250 Conn. 674, 695, 741 A.2d 873 (1999). Since the TPR trial court must find that reasonable efforts have been made by clear and convincing evidence, this court will make its own independent findings as to reasonable reunification efforts.
b. Reasonable efforts to reunify.
The court finds that the petitioner has failed to meet her burden of establishing by clear and convincing evidence that she has made reasonable efforts to reunify Ms. D. with her children. "Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word "reasonable" nor the word "efforts" is, however, defined by our legislature or by the federal act from which the requirement was drawn.
Our Supreme Court has said that "[r]easonable is a relative term which varies in the context in which it issued, and its meaning may be affected by the facts of the particular controversy . . . It is also synonymous with [equitable], fair, just . . . In employing that definition for the purpose of deciding whether the department did make reasonable efforts, we do not overlook the requirement that the department, in carrying out the public policy set forth by the legislature, must sustain not only what can be called the ordinary plaintiff's burden of proof but that of clear and CT Page 12741 convincing proof. It must be acknowledged that in matters of termination of parental rights, the department occupies a superior position. As one court realistically noted, "[t]he parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric or any combination thereof. The agency in contrast is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory . . . We hasten to add, however, that while a higher burden of proof rests on the department, reasonableness is an objective standard . . . and whether or not reasonable efforts has been proven depends on the careful consideration of the circumstances of each individual case. In our view, reasonable efforts means doing everything reasonable, not everything possible. On the other hand, such efforts should not make it impossible to attain reunification in a given case." (Citations omitted) In re Eden F., 48 Conn. App. 290, 311-312,710 A.2d 771, cert. Granted on other grounds, 245 Conn. 917, 717 A.2d 234
(1998)
After carefully considering all of the evidence presented, it is clear that while DCF made some efforts to reunify Ms. D. with her children, they were not enough to be considered reasonable, fair or just under the circumstances of this case. The evidence at trial clearly and convincingly established that Ms. D. loves her children, in fact, Dr. Krulee testified that "[s]he longs for her children."[73] The evidence also makes it abundantly clear and convincing that it was in an effort to protect her children from living in a shelter and moving to another school district that Ms. D. agreed to place her children in foster care in November 1998. While the children were in foster care, she maintained an open and liberal visitation schedule with them. In fact, she even took them to school on at least one, if not more, occasions.
There is no evidence that drugs or alcohol are an issue in this case. In fact, the evidence is clear that drugs and alcohol were never a problem in this case. The problems centered on untreated mental health issues, the lack of housing and the failure of DCF to present a coordinated case management plan to assist Ms. D. throughout this critical time in her life. Since Ms. D.'s involvement with DCF, she has had at least six different social workers. Her first social worker worked with her during the year 1997 until the children were adjudicated neglected and the dispositional order of a six month period of protective supervision was entered in February 1998. The court is mindful that this adjudication was not entered after a contested hearing but as a result of a nolo plea filed by Ms. D.
Although Ms. D. was present in court on the day that the order was CT Page 12742 entered, there is no evidence to suggest that the social worker, Benjamin Ohene, with whom she was expected to work for the next six months, was present in court. There is also no evidence that Mr. Ohene ever met with Ms. D. or the children during this time of court ordered protective supervision. According to the testimony of Ms. Lyon, by the time that the new worker was able to attempt to meet up with Ms. D., in April 1998, circumstances in her life had dramatically changed. As a member of the class often referred to as the "multicrisis poor,"[74] Ms. D. had been forced to seek shelter for herself and her children in a public housing facility known as a shelter. While there, she was hospitalized for an attack of anxiety and released the next day. A new and different DCF social worker was assigned to respond to the call made by the shelter. According to Ms. Lyons, Ms. D. requested help with housing. It should have been abundantly clear to any social worker responding to a call of this kind that some kind of mental health intervention was immediately required as well. After all, Ms. D. had just been released from the hospital for an anxiety attack. However, the record is silent as to what efforts, if any, were made in this regard. Ms. Lyons simply stated that she was offered parenting classes and told that DCF does not supply housing.
During this hectic and critical time in the life of this family, the period of protective supervision expired with no report, of any kind, being rendered to anyone regarding the welfare of this family. Not only did the child protection system allow this family to `fall through the cracks' the court system did as well. At an in court review of the protective supervision, the court was simply advised that the family had moved to Norwalk and therefor the case would no longer be heard in the Bridgeport court. Instead, it would be transferred to the Norwalk court. There was no oversight by the court system to make sure that a new date was assigned in Norwalk for an in court review of the period of protective supervision.
The court would be remiss if it did not note that no one ever filed a motion to extend the period of protective supervision in this case. This certainly would have brought attention to this case. However, the protective supervision expired by operation of law.
The evidence clearly establishes that Ms. D. suffers from a personality disorder as well as from a borderline level of intellectual functioning. As a result of her cognitive limitations, Dr. Krulee, testified that Ms D., may have "needed some direction, someone to tell her what it was that she needed to do."[75] He further testified that her borderline level of functioning may explain, to some degree, her lack of resourcefulness. "The department is required, pursuant to § 17a-112 (c) (1) to take CT Page 12743 into consideration her mental condition when determining what `reasonable efforts' to make at reunification." In re Antony B., 54 Conn. App. 463,479, 735 A.2d 893 (1999). The court considers it as most unreasonable that one of the social workers involved in this case was not even aware that a psychiatric evaluation had been ordered.
Dr. Rosado recognized Ms. D.'s limitation and recommended that a case manager be assigned to work with her to provide assistance in managing her situation at this time. The record is abundantly clear, that this is a mother who loves her children, wants to be with them and attempted to do as much as she could within her limitations to provide for her family. It is the public policy of the State of Connecticut, as codified in Section 17a-101 of the General Statutes: "To protect children whose health and welfare may be adversely affected through injury and neglect;to strengthen the family and to make the home safe for children byenhancing the parental capacity for good child care . . ." As overworked and overwhelmed as the child protection agency may be, it cannot overlook its basic mission, as declared by the legislature in this statute.
It is also abundantly clear, that these children are connected with their mother and have a strong bond with her. It is true, that Michael's bond is more intense, but that does not minimize the strength of the connection between Marquille and his mother. It is also true, that Dr. Rosado stated that given the profound needs that Michael has, it would be understandable and perhaps even appropriate to treat the children differently as far as permanency planning is concerned. However, Dr. Rosado also stated that he would be unable to comment in any great detail because he did not have the opportunity to evaluate Marquille individually.
DCF argues that Ms. D. was very difficult to stay in touch with because of her lack of permanent housing. The department also argues that since Ms. D. and her attorneys knew that she was ordered to attend a neurological and a psychiatric, she should have been calling DCF and asking the social workers to set up the appointments. However, the specific steps ordered by the court require DCF to provide case management services and not the other way around. It is the department that must provide the creativity and resourcefulness to meaningfully craft solutions to the problems affecting the families referred to it. The court recognizes that it is, indeed, challenging to engage families referred to a child protection agency. However, the skills of the workers are measured to a large degree in the extent that they are able to first, engage the families and then, to keep them engaged.
The court finds, by clear and convincing evidence, that DCF did not CT Page 12744 provide reasonable efforts to reunify Ms. D with her children. The court further finds that DCF did not meet its burden of proof regarding Ms. D.'s alleged unwillingness and inability to benefit from reunification services. The court finds that father Michael D. is unwilling and unable to benefit from reunification efforts.
B. ADJUDICATION
 1. MICHAEL D., THE FATHER.
a. The court finds by clear and convincing evidence that Michael D., the children's father has abandoned Michael and Marquille, within the meaning of Section 17a-112 (j) (3) (A).
b. The court finds, by clear and convincing, that there is no ongoing parent-child relationship between Michael D., and his sons Michael and Marquille within the meaning of Section 17a-112 (j) (3) (D).
2. CONNIE D., THE MOTHER
a. The court finds that DCF failed to present the court with clear and convincing evidence that Ms. D. has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Section 17a-112 (j) (3) (B1).
b. The court finds that Ms. D. did not abandon her children within the meaning of Section 17a-112 (j) (3) (A).
 III DISPOSITION A. MANDATORY FINDINGS.
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315,771 A.2d 160, cert. Denied, 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [Rev, to 1999) § 17a-112 (d)[now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E., CT Page 1274561 Conn. App. 185, 190, 763 A.2d 37 (2000). The court finds, by clear and convincing evidence, that:
1. As mentioned above, DCF did not offer timely services to Ms. D. The department was precluded from offering any services to father because of his lack of presence in these proceedings.
2. As discussed above, DCF did not make reasonable efforts to reunify mother with her children. Regarding father, however, DCF was prevented from making any reasonable efforts due to father's failure to present himself in these proceedings.
3. The court finds that DCF did not comply with the court ordered specific steps in that it did not provide reasonable case management services to Ms. D. and her children. It also failed to make timely referrals for psychiatric and neurological evaluations for Ms. D.
The court finds that DCF was prevented from make any referrals for father due to his lack of involvement in the case.
4. Michael and Marquille are bonded with their biological mother. They have also developed strong feelings and attachments with the foster parent, in whose care they have been in for a significant period of time.
5. Michael is nine years old. Marquille is seven years old.
6. The court finds that the father has made no effort whatsoever to maintain or develop any contact with his children. As discussed above, the court finds that Ms. D. has made many efforts to maintain contact with the children and to provide for their best interests.
7. The court finds that the father has not been prevented from maintaining any meaningful contact with his children as a result of an unreasonable act of any person. Again, as stated above in great detail, the court finds that the mother has a meaningful parent-child relationship with her children despite the failure of DCF to provide reasonable efforts to reunify her with her children.
B. ORDERS
The court finds, based upon the clear and convincing evidence presented, that it would be in the best interests of Marquille and Michael that the parental rights of their father, Michael D. be terminated. The court further finds, based upon clear and convincing evidence, that it would not be in the best interests of Marquille and Michael to terminate CT Page 12746 the parental rights of their mother, Ms. D. It is accordingly, ORDERED, that the parental rights of Michael D. are hereby terminated. The petition is dismissed as to mother, Ms. D.
The court orders that the commitment of the children remain in effect until further orders of the court. In addition, the court orders that Dr. Rosado conduct an individual psychological and intellectual evaluation of Marquille, as well as an updated evaluation and assessment of the relationship between Marquille and his mother. DCF is ordered to refer mother to a psychologist for purposes of self reflective psychotherapy for a period of no less than six months. The person to whom mother is referred shall have experience in providing this specialized type of psychotherapy.
The court further orders DCF to file a case plan for the children no later than November 7, 2002. This plan shall include updated reports, signed by the children's therapist and in Michael's case, Dr. Rosado, recommending the appropriate measures to be taken to promptly implement a visitation schedule between Ms. D. and her children. The plan shall also include the name, credentials and availability of a psychotherapist to provide Ms. D. with self reflective psychotherapy. This plan shall be filed in the Child Protection Session in Middletown. The court shall convene a hearing within two weeks of the receipt of said plan.
SO ORDERED.
 CARMEN L. LOPEZ, JUDGE CHILD PROTECTION SESSION